JENSEN, Master of the Bark Luna, *v.* THE STEAM-SHIP BELGENLAND.*

(*District Court, E. D. Pennsylvania.* November 29, 1880.)

1. COLLISION — FAILURE OF THOSE ON STEAMER TO SEE SAILING VESSEL—PRESUMPTION OF NEGLIGENCE.—A steam-ship and a bark collided at night in mid-ocean. The steam-ship was steering N. W. by W. ½ W., having her fore-try-sail, jib, and stay-sail set. The bark was sailing by the compass on a course precisely opposite. The wind was between S. W. and W. S. W. The night was dark and rainy, but there was no fog. The bark's helm was ported immediately before the collision. The mast head-light of the steam-ship was seen from the bark, but her side lights were not seen until after the bark had ported her helm, when the steam-ship's green light alone was seen. The lights of the bark, which were of less power than those of

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

the steam-ship, were not seen from the steam-ship until the moment of collision, when the bark's red light was seen. *Held*, that as the evidence satisfied the court that, with proper vigilance, the bark could have been earlier seen from the steam-ship, the fact that she was not seen showed conclusively an absence of proper care on the part of the steam-ship.

*Held, further*, that this conclusion was not overthrown by the fact that the steam-ship's side lights were not seen from the bark, since it appeared possible, from the report of assessors, that with the heeling of the steam-ship, and the bagging of her fore-try-sail in the position in which it was set, her green light was concealed from the bark, and the bark concealed from the lookout on the bridge of the steamship.

2. SAME—DUTY OF THOSE IN CHARGE OF STEAM-SHIP—LOOKOUTS—STATION OF—REDUCTION OF SPEED.—The duty of those in charge of a steam-ship to increase the number of lookouts when the weather is such as to call for especial vigilance, and especially to station a lookout on the turtle-back, and reduce the speed, if necessary to enable him to maintain his station and perform his duties, discussed.

3. SAME—STATEMENTS OF CREW OF INJURED VESSEL IMMEDIATELY AFTER THE COLLISION.—The weight to be given to statements made by the crew of the injured vessel at the time of their rescue, and after they were taken on board of the other vessel, if contradictory to their subsequent testimony, considered.

In Admiralty. Libel for collision.

The facts were as follows: On August 4, 1879, at about 10 minutes of 2 o'clock A. M., the steam-ship Belgenland collided with and sank the bark Luna in mid-ocean. The early part of the night had been fine, the moon being full, but about midnight it had clouded over, and, at the time of the collision, there was a drizzling rain but no fog. There was not much sea, but a heavy swell. The wind was between south-west and west-south-west. The steamship was steering north-west by west, half west, and making a little over 11 knots. Her mast head-light and two side lights were properly set and burning. Her fore-try-sail, jib, and stay-sails were set. She heeled to starboard from 10 to 15 degrees. Her second officer had charge of the deck, and was stationed on the port side of the bridge. A lookout man was stationed on the starboard side of the bridge, and the fourth officer was stationed at the after compass, near the mizzenmast. The rest of the watch, with the exception of the man at the wheel, were underneath the turtle-back or top-gallant forecastle.

The steam-ship was about 416 feet in length, and about 38 feet beam. The bridge was 150 or 180 feet from the bow, and six or seven feet higher than the turtle-back, which was about 25 feet above the water.

The bark was sailing with the wind free, her course being south-east by east, half east, and she was making about seven and a half knots. Her side lights, which were the regulation lights prescribed by the Norwegian Veritas, but which were of much less power than the side lights of the steam-ship, were set and burning. The watch on deck consisted of the first mate and three men. A lookout was stationed on the top-gallant forecastle. About 1:45 A. M. this lookout sighted the mast head-light of the steam-ship right ahead, and reported it. The mate looked, and saw the light ahead, but a little on the starboard side, and he ordered the man at the wheel to keep her steady. No side lights of the steamer could be seen, but, as the vessels approached, her mast head-light came a little on the port side, and at the same time her sails became visible. The steamer was by this time so close that to those on the bark a collision seemed inevitable, and the mate ordered the bark's helm hard a-port. In a few seconds the steamship's starboard light came into view, and in another instant she struck the bark on her port side, cutting her completely in two, diagonally, from the after-part of the forerigging to the forepart of the main rigging. The bark sank, and, with the cargo, became a total loss. The bark was not seen by those in charge of the steam-ship until immediately before the collision, when the second officer saw her head-sails, and the lookout on the starboard side saw her after-sails, and, as she rolled over, saw her port light. A few seconds before, a steerage passenger, looking through a port-hole on the star-board side of the steam-ship, had seen the port light of the bark, and reported it to his room-mates.

The theory of the libellant was that the courses of the two vessels, although apparently opposite, were in reality slightly intersecting; that the bark, having the wind free, was necessarily yawing; that when the steamer's light was first sighted the bark had fallen off, and that, as she luffed gradually to her

course, the steamer's light was brought a little on her port bow; that owing to the courses being intersecting the port light of the steamer was not visible, and her starboard light was masked by her fore try-sail, which at the same time screened the bark from the steamer's lookout. The theory of the respondents was that the two vessels were sailing on opposite but parallel courses; that the steamer was approaching a low bank of haze or mist, in or towards which the bark was sailing, and which prevented the side lights of either vessel from being seen from the other, although the mast head-light, being more elevated, was visible; that the apparent change of position of the mast head-light of the steamer from starboard to port, was caused by the man at the wheel of the bark allowing the vessel to luff up; that the mate, supposing the change of position of the light to be due to a change in the steamer's course, altered the course of the bark and thus brought her across the bow of the steamer and caused the collision.

*Henry Flanders* and *J. Langdon Ward*, for libellant.

*Henry R. Edmunds* and *Morton P. Henry*, for respondent.

BUTLER, D. J. On the fourth of August, 1879, between the hours of 1 and 2 o'clock in the morning, the bark Luna, laden with sugar, under way from Porto Rico to Queenstown, in latitude 49 degrees and 33 minutes, and longitude 21 degrees and 43 minutes, on a course, by the compass, S. E. by E. $\frac{1}{2}$ E., with a fresh breeze from between S. W. and W., and W. S. W., met the steam-ship Belgenland, traversing the same course, by the compass, in an opposite direction, and was run down by the latter vessel and sunk.

Was the steam-ship in fault? It was her duty to keep out of the bark's way. About this there is no controversy, nor, in my judgment, room for controversy. The presumption is, therefore, against her; the burden of proof is hers. She must show a sufficient excuse for the failure to keep off, or must answer for the loss.

The excuse set up and relied upon is twofold: *First,* (in the language of the answer,) "that the bark was coming down before the wind, enveloped in a shower of rain and mist,

which struck the steam-ship just before the collision, and obscured the bark at the critical moment when she approached the steam-ship, and that the failure to discover a vessel, produced by such a state of the atmosphere, is one no skill or watchfulness on the part of the lookouts and officers can guard against;" and, *second*, "that the bark changed her course previous to the collision, and the result is attributable to such change."

The first branch of this defence presents the question whether proper vigilance was exercised, and the failure to see the bark inevitable. And this involves a consideration of the state of the weather and atmosphere, the character of the steam-ship's lookout, the testimony of witnesses who describe the distance at which objects could be seen at the time, and the presence or absence of lights on the bark.

As respects the condition of the weather and atmosphere, there is no material disagreement in the testimony. The libel says "there was a drizzling rain, with a fresh breeze from between south-west and west-south-west," and the answer says, "the breeze and character of the night were such as stated in the libel, except that there was some mist, with passing showers." The moon was up, but hidden by clouds. There was little sea, though the swell was heavy. The atmosphere was somewhat thick, and the night dark. There seems to have been no fog.

As respects the steam-ship's lookout, more might be said than I deem it necessary to say. That a lookout should have been maintained from the turtle-back, under ordinary circumstances, is plain. The reason assigned for omitting it and relying upon a sight from the bridge, 180 feet back, is the alleged occasional plunging of the bows into the sea, and the obstruction presented by spray at that point. That a sailor could have stood there with safety is admitted. It is asserted, however, that he could have seen nothing from that place. The night was such as to call for special vigilance. Massin, a seaman, was placed on the starboard side of the bridge; Wismer, the second officer, was stationed on the opposite side, and Ledder, the fourth officer, at the after-

compass. The latter visited the bridge, and "looked around" for a few minutes from the starboard side, shortly before the accident. The officers recognized the necessity for especial care; they conversed about it, and cautioned Massin respecting it. Wismer said to Ledder that "it was a bad night to see vessels; go over to the other side of the bridge, and tell the man there to keep a good lookout, and to look around youself; that if a man kept a good lookout he could see a vessel." Ledder says he did as requested, and returned to Wismer just before the accident. Beyond this there was no vigilance. The number of men on lookout duty was not increased. The ship was kept up to 11 miles an hour, (the same speed she was making before the weather changed.) In view of the direction of the wind, a reduction of speed would doubtless have diminished the quantity of spray over the turtleback. If, by this means, (a reduction of speed,) an outlook could, profitably, have been maintained from that point, it certainly should have been. Speed is important; but human life is more important. When difficulties intervene to prevent a reasonably safe lookout, (and it matters not whether this arise from the existence of fog, or other cause,) the speed should be reduced, if, by so doing, the unusual danger of collision may be diminished. Where such difficulties arise from the existence of fog, the necessity of reducing the speed is not, and cannot be, questioned. And no valid reason can be assigned for a distinction between such cases, and others, where the difficulty of seeing arises from other cause. The precaution is rendered necessary, and its observance required, by the difficulty of maintaining a safe lookout, without regard to the cause from which it arises. Conceding the difficulties in the way of maintaining a safe lookout, on the occasion in question, to have been such as the respondent's witnesses describe, I find it difficult to avoid the conclusion that the rate of speed should have been reduced, and the experiment of a sight from the turtle-back tried. I incline also to the opinion that the number of men on lookout duty should have been increased. Had such precaution been observed, it is quite probable the accident would have been avoided.

This inquiry need not, however, be pursued.  The fact that the bark could have been seen, with the exercise of proper vigilance, earlier than she was, (of which I am fully convinced,) shows conclusively an absence of proper care. Wherein this consisted need not be determined.  The bark should have been seen earlier.  That she could have been, even without lights, seems to admit of little, if any, doubt.  Wismer (of the steam-ship) says he could see a ship, without lights, the fourth of a mile off, at the time, and believed so then.  Sodergren (also of the steam-ship) thinks a man with a sharp eye might have seen a ship, without lights, half a mile off.  Lutz (of the steam-ship) says he saw the bark as she came up, and looked out the air-port of his state-room a *third* time before reporting that she would strike.  Peters (of the steamship) says he heard the report, and passed from below to the deck before she struck.  Captain Jackson (of the steamer) says he did not lose sight of the wreck, which King says was 500 to 600 yards away, and without lights. Peters says he kept the wreck in view from the steam-ship until they left, and could see the mizzen-mast above the water. King (of the steam-ship) says: "When at the wreck, judging as near as I could of the distance, it was from 500 to 600 yards from the steam-ship; I could count every port-hole." Tonneson (of the bark) says he saw the steam-ship's *sails* when she was three lengths away.  Captain Simonson (of the bark) says he saw her *sails* as she came up, and, after the collision, saw her constantly, as he clung to the wreck. Edwardson (of the bark) says he saw the steam-ship's *sails and rigging* as she came up, and kept her constantly in view from the wreck.  Jansen (of the bark) says he also saw her from the wreck.  That these witnesses may be inaccurate, and, no doubt, are, respecting time and distance, must be admitted. Still, their testimony is convincing that the bark, even without lights, might have been seen earlier than she was.  With lights she could certainly have been seen, according to the concurrent testimony on both sides, from half a mile to a mile off.  That her lights were burning is not, in my judgment, open to serious question.  Simonson, her first officer,

says he looked at them between 12 and 1 o'clock, and saw them burning brightly. The starboard light was seen burning at the moment of the collision. The other was not then in position to be seen; but the presumption (from the facts just stated) clearly is that it also was still burning. No importance can be attributed to the libel's silence on this subject. The failure of the answer, when accounting for the accident, to suggest that the lights were not burning is more significant. The conclusion is, therefore, unavoidable, that the bark could have been seen earlier than she was.

The respondent's argument, based on the inability of the bark's lookout to see the steam-ship's powerful side lights as the vessels approached, (pressed with great earnestness and ability,) has received careful attention. The light in position to be seen was that on the port side. Why it was not seen cannot now be known, with certainty. Whether it was because of obstruction from the steam-ship's fore-try-sail, as argued by the libellant, cannot be ascertained. That it may have been, seems possible to the assessors, as well as to myself. Not, of course, if the sail was held in proper position; but, precisely what was its position, the respondent's witnesses differ about. That the inability to see the light, however, did not arise from atmospheric difficulties, seems clear; unless, indeed, the weight of the evidence on both sides be disregarded. As already shown, much less powerful lights, and even objects without lights, could be, and were, seen at a greater distance than these lights were off at the time. The allegation that the bark was "enveloped in a shower of rain and mist, which hid her from view," is not supported by the evidence. The first branch of the defence (that the accident resulted from inability to see the bark, by the observance of proper care,) therefore, fails. So far from the evidence sustaining it, as an affirmative proposition, the contrary is shown to be the fact.

Did the bark improperly change her course? That she endeavored to change it at the moment of collision, and was partially successful, is admitted. This, however, is not important. Did she change it earlier? Her duty was to hold

her course. All the surviving crew who can speak on the subject say she did hold it. The testimony of the man at the wheel cannot be had. He was drowned. The mate on duty says he gave the order "to keep her steady and be careful;" that he directed no change, and that none was made, until immediately before the accident, when collision was imminent. It is argued, however, from the testimony of the mate and the lookout, that the vessels were moving on parallel courses, and that, had the bark not changed her direction, the collision would not have occurred. These witnesses say the steam-ship, when first observed, seemed to be "right ahead, but a little on the bark's starboard bow." The language of the mate is, she was "right ahead, but a little bit on the starboard side." The lookout says she appeared to be "right ahead," but a little on the starboard side of the jib-boom. He reported her at the time to be "right ahead," as the mate and Edwardson, who carried the report, state. He further says that, as they approached, she seemed "to draw a little more on the lee bow," and came up in that position—her starboard light, a moment before the collision, showing to the bark's port-light.

From this testimony the respondent's counsel argue that the bark improperly changed her course, southward, and ran across the steamship's bow. This argument is legitimate and forcible, and was pressed with great ability. In the absence of the direct and positive testimony before referred to—that the bark did not change—it would be entitled to considerable weight. Even if it stood alone, however, it would not be a safe guide. Precisely how the vessels approached cannot be now known. To all who saw them, prior to the moment preceding collision, (Tonneson, the bark's lookout, Simonson, her first mate, Edwardson, a member of her crew, and Lutz, a passenger on the steam-ship,) they appeared to be moving virtually on the same course, and coming up nearly, if not quite, "head on." Lutz says, when they came together "her bow met our bow," and he repeats this expression. At the moment of the catastrophe, however, it seems to be clear that the headings of the vessels were

such as to show the steamer's green light to the bark's red. Whether this was so before the course of the bark was affected by the first contact, (for it is quite possible she was thus turned to some extent when reached, before the shock was perceptible,) cannot be known. The position of the lights, and her apparent slight change when approaching—described by the witnesses—may possibly be accounted for by the impracticability of keeping the vessels (especially the bark) steadily on a direct course, under existing circumstances, of wind and sea. The latter vessel would necessarly yaw more or less; and it is possible, if not probable, that the steamship did not hold her course constantly with entire steadiness. Both would incline to windward, and it is not impossible, nor very improbable, that in moving on the same general course they would frequently head as they are described to have done at the moment of collision. Very little variation from a direct course would be necessary to bring the lights into the position stated. It does not follow, however, from the testimony, that the general courses of the vessels were either parallel or the same. They may have been slightly intersecting; the evidence is not entirely inconsistent with the idea that they were. The indications of the compass cannot be relied upon with certainty, where the question is so delicate. This is fully shown and explained by the answers of the assessors. But whether these suggestions, respecting the movements of the vessels, are well founded or not, the inferences on which the allegation, that the bark's course was changed as she came up, rests, are too uncertain to be accepted, especially against the direct and positive testimony to the contrary, before referred to.

It is proper to say, in this connection, that I would place very little reliance on the statements of the mate and other members of the bark's crew, made at the time of their rescue, if they differed from the testimony of these witnesses subsequently taken. Their minds were too much disturbed to admit of careful statement, and those who heard them were hardly in condition for accurate understanding or recollection of what was said. Nor would I deem it safe to attach much

weight to the statements subsequently obtained while the rescued men were on board the steam-ship. Conceding the propriety of interrogating them as was done, their situation, and their imperfect understanding of the language in which they were interrogated and made answer, and the fact that the answers were not taken literally in the terms they employed,— would render it unsafe to rely on the information thus obtained, as a means of contradicting or qualifying what they afterwards said on oath. In my judgment, however, no material disagreement exists between the statements referred to and the testimony of the witnesses subsequently obtained.

A decree must be entered in favor of the libellant.

The court propounded certain questions to nautical experts called as assessors, which, with the answers thereto, were as follows :

Captains Gallagher and Hewitt will please furnish me the answers to the following questions :

*First.* Supposing the bark Luna to have been running free, with the wind—a stiff breeze—on her starboard quarter and a heavy swell in the sea, would the rudder keep her steadily on a direct line or course? If not, how much would the yawing be likely to carry her off, with proper attention to the wheel? *Answer.* A bark running free, with a stiff breeze on the starboard quarter and a heavy swell, allowing that she is a fair-steering vessel, would yaw each side of her course from one-half to one point, with a constant tendency to eat up into the wind, except where she takes what is termed a wipe-off or sheer to leeward, which only happens occasionally, therefore her course would be a crooked one, and the result, that she would probably make from a quarter to a half point to windward of that steered by compass.

*Second.* What effect, in this respect, would the wind and swell have on the steam-ship's course, running in the opposite direction, at 11 miles an hour, with sails set (so as to have the benefit of the wind) and having a heel of 12 degrees to starboard? *Answer.* The propelling power of the steamer, not being dependent upon sails, the course made should be

the same as that steered, except the swell of the sea might set her a little to leeward bodily, and having a heel to starboard of 12 degrees would have a tendency to divergence from the course steered by compass, and to bring the ship's head a little to windward.

*Third.* Supposing the respective compasses of the vessels indicated the same course, in opposite directions, would it follow that the course was the same? State how much compasses vary when placed side by side; and how much the steam-ship's compass would probably be affected by attraction of the iron in the vessel? State whether the indication of the compasses, under the circumstances above supposed, in this interrogatory, (that the vessels were on the same course,) would be irreconcilable with the idea that their courses were slightly *intersecting*? *Answer.* It does not follow that the vessels were on the same course because the compasses on board so indicated. Variations in compasses are very common. That on the steam-ship would be affected by attraction of the iron, and the one on the bark would probably not agree with it precisely if the two were placed side by side, either there or elsewhere. Out of half a dozen compasses, adjusted with ordinary care, three may not be found to agree precisely. The indications of a compass are not, therefore, a sure guide to the precise direction of the vessel, though it will approximate very nearly. While the compasses of the two vessels, going in opposite directions, indicate the same courses, the *true* courses of the vessels may be intersecting; very slight variations in the compasses would be necessary to produce this result.

*Fourth.* Supposing the steam-ship, when first seen from the bark, to have been a mile away; that she appeared to starboard of a line directly ahead; that, as the vessels approached, she seemed to be drawing towards the bark's starboard bow, and, when they met, their respective headings were such as to show the steamer's starboard light to the bark's port light,— might this change occur with proper care over the wheels of the respective vessels, and while each was endeavoring to keep her course, the wind and sea being as before stated? If

it might so occur, please to explain why, in your judgment, it might? *Answer.* Supposing the circumstances to be as stated in the fourth interrogatory, the vessels might come together in the positions stated, even with the exercise of proper care over their respective wheels, and while each was endeavoring to keep her course. This might occur either from the yawing of the vessels, and especially the bark, and their constant tendency (especially the bark) to eat up into the wind, which would, or might, frequently occur on their course, and set their heads so as to show the steamer's green lights to the bark's red light, if they were at the time in the vicinity of each other.

*Fifth.* Supposing the steam-ship's bows to be occasionally plunging into the sea, and spray to be flying over the turtle-back, but not to such an extent as to render it unsafe for a seaman to stand there, should a lookout have been stationed there—the night being dark, and the atmosphere such as to create apprehension in the officers' minds respecting the likelihood of seeing vessels as they approached? *Answer.* Supposing the circumstances to have been such as are stated in the fifth interrogatory, the speed of the vessel should have been diminished, and a lookout placed on the turtle-back. A diminution of speed would have decreased the amount of spray. If the officers had apprehensions about the ability to see approaching vessels, ordinary prudence would have required, in addition, an increase in the number of lookouts.

This answer covers the sixth and seventh interrogatories, as well as the fifth.

*Sixth.* Supposing the circumstances to be such as stated in the interrogatory immediately preceding, would a diminution of the steamer's speed have tended to reduce the quantity of spray over the turtle-back, and to improve the prospect of maintaining a safe lookout from that part of the vessel?

*Seventh.* Supposing the circumstances to be as stated in the fifth interrogatory, would ordinary care and vigilance have required the speed to be reduced and a lookout tried from the turtle-back? Answered in answers to fifth and sixth interrogatories.

*Eighth.* Looking at the model of the Belgenland, and supposing the fore-try-sail to be somewhat lower, (as is admitted it should be to correspond with the sail on the vessel,) state whether it was possible for this sail to have gotten in front of and hidden the starboard light from the bark on the night of the collision, supposing the sail to have been set and trimmed as stated by the respondent's witnesses, whose testimony respecting this will be handed you herewith? *Answer.* In answer to this interrogatory, the tack of the fore-try-sail, being somewhat lower than that shown on the model of the Belgenland, it is quite possible that, with the heeling of the ship and the bagging of that sail, it would obstruct the green or starboard light from the bark, and also obstruct the bark from the lookout on the bridge.