### THE PARTHIAN.

### GOULD v. BOSTON & PHILADELPHIA STEAMSHIP CO.

#### (Circuit Court of Appeals, First Circuit. April 13, 1893.)

#### No. 15.

1. COLLISION—FOG—WANT OF PROPER FOG HORN.

The owners of a sailing vessel cannot substitute for the fog horn which she is required by the sailing regulations to carry an instrument blown by steam, and in their opinion more efficient than the fog horn. 48 Fed. Rep. 175, affirmed.

2. SAME—DUTY OF STEAMER—FAILURE TO SLACKEN SPEED.

The P., a steamer, while going through a dense fog, maintained a speed of 12 knots until she heard the signal of an approaching vessel, on which she slowed to half speed, and kept up that rate when the vessels were coming nearer and nearer, and did not slacken or reverse until the vessel appeared out of the fog. Held, that the P. was in fault in the collision which occurred. 48 Fed. Rep. 175, reversed.

3. SAME—SIGNALS—RULE 19.

A steamship is authorized to use the signals prescribed in sailing rule 19 only to communicate with a vessel which she has in sight, and not with a vessel which is invisible because of fog.

Appeal from the District Court of the United States for the District of Massachusetts.

In Admiralty. Libel by Moses M. Gould against the Boston & Philadelphia Steamship Company for damages resulting from a collision between the steamship Parthian and the schooner Florence about 55 miles southeast from Sandy Hook. There was a decree dismissing the libel, (18 Fed. Rep. 175,) and libelant appeals. Reversed.

At the time of the collision the weather was foggy, and the wind light, blowing in a direction between W. N. W. and N. N. W. The fault charged by the Florence against the Parthian was that she did not change her course, as she should have done, upon hearing the fog signal of the schooner, and that she was going at an improper rate of speed in a fog. The faults charged against the schooner by the Parthian were that she did not have a proper fog horn; that she did not give with it the signals required by law to be given by a sailing vessel in a fog; that she used, for giving signals in a fog, an instrument, the sound of which resembled that of a steamship's whistle, and the effect of which was to mislead the Parthian, causing her to change her course in the belief that a steamship was approaching, in consequence of which the collision occurred. The instrument used by the schooner in place of the required fog horn was a horn blown by steam furnished by a donkey engine.

The sailing regulations referred to in the opinion of the court are as follows, (23 St. p. 441:) "Art. 19. In taking any course authorized or required by these regulations, a steamship under way may indicate that course to any other ship which she has in sight by the following signals on her steam whistle, namely: One short blast to mean, 'I am directing my course to starboard;' two short blasts to mean, 'I am directing my course to port;' three short blasts to mean, 'I am going full speed astern.' The use of these signals is optional, but if they are used the course of the ship must be in accordance with the signals made."

A. A. Strout and Eugene P. Carver, (Edward E. Blodgett, on the brief,) for appellant.

Lewis S. Dabney and Frederic Cunningham, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. Attention to the positive statutory regulations for the prevention of collisions will dispose of the contention that the fog horn used on board the schooner Florence complied with them:

"Article 1. In the following rules, every steamship which is under sail, and not under steam, is to be considered a sailing ship; and every steamship which is under steam, whether under sail or not, is to be considered a ship under steam."

Having established this definition of the various kinds of vessels, the regulations proceed to impose duties on each class for observance under various conditions and circumstances. For clear weather, and by daylight, the management of the ship is prescribed. Specific directions for lights at night are added. When, by day or by night, on account of "fog, mist, or falling snow," neither vessels nor their lights can be seen far, recourse is had to sound signals. And as the information conveyed by mere inarticulate sounds is, at best, imperfect and indefinite, it is important that the signals be arranged, so far as may be, to have definite significance. The means to accomplish this are diversity of in-

struments producing the sounds, varying durations of signals, the frequency of repetition, and the number of distinct sounds to complete a signal.

A steamship must be equipped "with a *steam whistle, or other efficient steam sound signal,* so placed that the sound may not be intercepted by any obstructions, and with an *efficient fog horn, to be sounded by a bellows or other mechanical means,* and also with an efficient bell."

It will soon be evident that these various sound-producing implements cannot be interchanged for convenience, or at caprice. Each has a specific use, and to that use it must be confined.

"A sailing ship shall be provided with a similar *fog horn and bell.*"

When the vessel is under way, one appliance must be resorted to for making a sound signal, and this must not be the same for a steamship when under sail, and when under steam. In the one case, she is to be considered a steamship, and must use her steam whistle or other steam sound signal. In the other, she is a sailing ship, and must announce her presence by the means appropriate to a sailing ship, namely, by a fog horn sounded by a bellows, or other mechanical means. A sailing ship, whether a steamer for the time being only under sail, or a vessel having only sails as her means of propulsion, must give her signals by a fog horn, and is not permitted to make use of any steam whistle, or other steam sound signal reserved for the exclusive use of steamships. Both kinds of vessels, when not under way, shall make their signals by a bell.

Thus it is plain that the statute requires a steamer to be provided with three kinds of apparatus, because she is liable to be rated in three classes,—a steamship under way, a sailing ship under way, and a vessel not under way. The sound instruments of a sailing ship are for like reason reduced to two kinds; the two belonging to the two conditions in which she is liable to be,—under way, or not under way. As the statute is, it is not the province of the court to consider whether, practically, there is a distinguishable difference between the sound that is emitted by a steam sound signal, and that made by a fog horn operated upon by a blast of atmospheric air. Neither have the owners or masters of vessels the right to disregard the requirement of the regulations prescribed by law, and to substitute one instrument or one signal for another.

"In a fog, all vessels must do all that is required of them by law or usage." "Actual safety is dependent on a strict performance by each of all their respective duties." The Eleanora, 17 Blatchf. 102. The schooner Florence was not provided with the means for giving sound signals prescribed by the act of congress, and for that was in fault. Her owners cannot be permitted to say she had something better. Nor can it be held that this fault on the part of the schooner did not contribute, and could not have contributed, to the collision. All the witnesses from those aboard the Parthian, passengers and officers and crew, testify that the signal of the schooner was taken to be that of a steamship.

Nor is this the only statute regulation violated by the schooner, whereby the distinction between the sound signals of a steamship, and those of a sailing ship, was defeated. Rule 12 expressly requires the steamship to make "prolonged blasts," and the sailing ship to make "blasts." There is only one reasonable construction of this rule, in regard to the length of the sounds to be produced,—one vessel must give long, and the other short, sounds, that their characters may be distinguished. Of the witnesses on the part of the schooner, Capt. Gould, Mr. Buckler, the mate, and Doyle, who was at the wheel, testify that long blasts were made on their steam fog horn. The mate says that at first he ordered the man tending the fog horn to blow a long blast, and then, fearing the seamen would become excited, he took the lanyard himself, and blew long blasts. Capt. Crowell, second mate Crowell, Huston, the lookout, and Morse, a passenger from the Parthian, describe the schooner's blasts as long. No witness on either side describes them differently. This confirmed the opinion, based on the nature of the sounds, that a steamship was approaching, and in that belief the officers of the Parthian directed her movements.

Furthermore, notwithstanding the denial by the libelant's witnesses, the preponderance of evidence is that once, at least, the schooner replied to the steamer's indication that she would direct her course to port with two short blasts. This reply was misleading, and without excuse. It meant either the approach of a vessel under steam, or of a sailing vessel on the port tack, when in fact it was given by a sailing vessel on her starboard tack. It did actually mislead, and influenced the action of the steamship. With the conclusion of the district judge, that fault on the part of the schooner contributed to the collision, we concur.

But we cannot agree with his opinion that "the disaster happened solely through the fault of those in charge of the Florence, in making fog signals by means of an instrument not sanctioned by the sailing rules." The fog, though of short duration, was very dense while it lasted. No one pretends that a vessel could be seen more than two or three lengths of the steamer. The Parthian had maintained her full speed, of about 12 knots, notwithstanding this short range of vision. In this she violated the 13th sailing rule, which required a moderate speed, and she took all the risk of the consequences. While proceeding at that rate, she was advised by a sound signal of the proximity of another vessel under way. Whether it was a steamship or a sailing ship, the obligation of caution was thereby cast upon her. The 18th sailing rule commanded her, "when approaching another ship so as to involve danger of collision, to slacken her speed, or to stop and reverse, if necessary." That danger of collision was involved, is clear from the statement of the captain of the Parthian:

"I found that we were coming together at an angle like that,—an obtuse angle; and I knew, if we kept on that course, we should collide,—come across each other's path,—surely."

How, and under what conditions, this duty was met, will best be shown by a few extracts from the testimony of Capt. Crowell, master of the Parthian, who may be trusted to have given an account of what was done by him, and under his orders, as favorable as the facts would permit.

"Question 54. How, when you first heard it, [the signal of the Florence,] did it bear from you? Answer. It bore about two and a half points on our port bow, as near as I can say. Q. 55. What did it sound like? A. It sounded like a steam whistle. Q. 56. Now, go on, captain, and tell in your own way—tell slowly and particularly—what occurred after that; what you did, and what you heard, and what orders you gave. A. I blew about four times, and I found that we were coming together at an angle like that,—an obtuse angle; and I knew, if we kept on that course, we should collide,—come across each other's path,—surely." "Q. 67. Now, you say you made up your mind he was crossing your bow at an obtuse angle, and, if you both kept on, that there might be a collision. What did you do? A. I slowed my ship down, and gave two whistles, signifying I wished to go to port. And always, when I can get an answer, I feel safe that we understand each other, and we can pass without any difficulty. But this being one blast,—one blast is merely a fog signal,—and, if you can do that, you are always in safety to do that thing. We often do it." "Q. 73. When you gave the signal with the two whistles, what happened after that? A. I repeated them. Q. 74. Did you get any answer? A. I got one blast from the stranger. On my second blast, I got two. Q. 75. On the second what? A. My two blasts. Q. 76. Your second signal,—the two blasts of the whistle? A. Yes; that I wanted to go to port. Q. 77. Then what did you get? A. I got two from him. Q. 78. What kind of blasts did you get from him? A. Well, they were fairly blown. I understood them that I could go to port. Q. 79. What did you do then? A. I put my wheel to starboard. Q. 80. Up to that time, had you seen him at all? A. No, sir. Q. 81. Had he been coming closer? A. Closer; yes, sir. Q. 82. Then what did you do next? A. I blew two blasts again, and got one in answer. Q. 83. Then what did you do? A. Then I stopped my ship, and reversed the engine; gave the bells to reverse. She then seemed to be very close, and it appeared to me that there was no other way but to stop my ship, which I did. I rang the bells to stop her and back her. Q. 84. Were they obeyed in the engine room? A. Yes, sir; there is no doubt of it." "Q. 87. Then, captain, what followed, after you had stopped and reversed? What next happened? A. The next thing, the schooner was right under our bows, as it were, within a hundred feet of us,—standing across our bows with all her sails set, and very close aboard,—right almost on me." "Q. 107. How fast do you think your ship was going when you struck her? A. I think she might be going five or six knots,—four or five knots. Mr. Carver, libelant's proctor: You said five or six. The Witness: I recall that, and I say four or five. I will say four knots. I think she might be going four knots,—three or four knots; not more than that. Half speed is about six knots. I know she had been reversing, and I had stopped her, and I know it must have detained her very much." "The Court: Does he say he saw the schooner at the time he reversed? The Witness: Just reversed; and the schooner, about the same time I stopped her and reversed her, and about the same time, she appeared right over my bow. Q. 118, by the Court: Did you give the order to reverse before you saw her, or after? A. Before. Q. 119. Just before? A. Just before. We were right close onto her. There was no distance, scarcely."

From cross-examination:

"x-Q. 156. How far distant should you judge the schooner was when you first heard her horn? A. She might have been a mile and a half or two miles off; I couldn't tell, of course. x-Q. 157. And the direction in which they were going was about like that, wasn't it? A. It was, I suppose, at an obtuse angle. x-Q. 158. What did you do then with your helm? A. When I saw we were crossing each other's track, I deemed it safe to slow my ship down to half

speed, and 1 blew two whistles." "x-Q. 160. When you found that these two vessels were going, or supposed that they were going, in about that direction, what did you do with your helm? A. I kept my course till I slowed my ship, and gave two blasts, and got the answer, and then I put my wheel to starboard." "x-Q. 223. Half speed is a little better than six knots, isn't it? A. I suppose it is about six or seven knots. I presume that is the calculation." "x-Q. 247. Suppose that your steamer was going ahead at half speed, and you wanted to stop her. A. Yes. x-Q. 248. And you rang full speed astern. A. Yes. x-Q. 249. How far do you think your steamer would go ahead through the water before she came to a standstill? A. Going ahead at half speed? x-Q. 250. Yes. A. Well, I suppose she would go about eight hundred feet, perhaps." "x-Q. 266. Now, you said on your direct examination that this sound, when you first heard it, bore about two and a half points on the port bow. That is correct, isn't it? A. That is correct. x-Q. 267. And you also said on your direct examination that the relative bearing remained about the same? A. About the same; yes, sir. x-Q. 268. There isn't any doubt about that, is there? A. No, sir; I don't think there is. That is my own judgment. It seemed as if she was coming right down, and we were crossing each other's track. It seemed as if we were bound to. x-Q. 269. How many times did you blow your whistle before you made the signals you spoke of? A. I think about four times, as near as I can recollect. x-Q. 270. And then you said you made a signal of two whistles? A. I did. x-Q. 271. What kind of a signal was that? A. That was two short whistles, as you might whistle,—one, two,—like that. x-Q. 272. And the next time you whistled, you made two other short whistles, did you? A. Yes, I repeated them. x-Q. 273. After you had made those signals, did you make any other signal before you struck the schooner,—any other fog signal? A. Yes. x-Q. 274. How many? A. Two more. x-Q. 275. And, after you made those two signals, you gave the order for her to stop, didn't you? A. Yes, sir." "x-Q. 277. How long a time do you think it was intervened between those two signals that you made, of two whistles each? A. I suppose about not more than fifteen seconds. I was anxious then to get an answer, and got it, and then I repeated the two, and then I got one from the vessel. Then I stopped." "A. to x-Q. 281. After I had signaled twice, and got an answer from the stranger, I repeated it very quick,—in, say perhaps, fifteen seconds or less, maybe. I can't say exactly. When I got one signal, then I stopped my ship, and rang to back full speed astern." "A. to x-Q. 283. I didn't blow another blast, I think, except the two whistles. When I got the schooner's one whistle, I stopped my ship, and reversed the engine." "x-Q. 286. How long was it, in your opinion, after you made the second signal of two whistles up to the time of the collision? A. I suppose it was not over half a minute. x-Q. 287. and you don't think that during that time you made another fog signal? A. I can't say I did. I don't recollect about that. But the schooner was in sight. When we had reversed our engine the schooner appeared right across our bow, going from the starboard to the port side. x-Q. 288. You reversed the engine immediately after making this last signal? A. Yes, sir. x-Q. 289. Now, captain, after you made the second signal, up to the time of the collision, you could not have got out of the way of any vessel at all, could you? A. I don't believe I could, but it is possible that I might have done it, if I had known it was a sailing vessel."

From these answers we learn that, in a fog so dense that a vessel could be seen only a few hundred feet, a speed of from 10 to 12 knots was maintained until the signal of some vessel approaching, on lines that were understood to involve danger of collision, was heard, and then the steamer was slowed to half speed,—six or seven knots,—assuming that the movement of the ship was at once reduced on the slowing of the engines. This half speed was kept up till within a half a minute, or a little more, of the collision, although the two vessels continued apparently—and, as the result showed, actually—to be nearing each other, on lines that would bring them

together, and at half speed the forward movement of the steamer could not be arrested short of 700 or 800 feet. No order to slacken the speed of six or seven knots, or to stop and reverse, was given till the vessels were so close upon each other that immediately after it was given the schooner appeared out of the fog, crossing the bow of the steamer, with, as the master says, "scarcely any distance between them."

From the moment the steamer entered the fog to the collision, she was in the wrong. Save in the one particular of giving prolonged blasts with her whistle, she wholly failed to observe the requirements of the statute. Even if she had gone at half speed,—which was too fast in that fog, at the place she was,—this collision would not have occurred; much less if her speed had been moderate. The Eleanora, 17 Blatchf. 100.

The assumption of Capt. Crowell that he had a right, under the conditions in which he found himself, to use and act upon the signals specified in the nineteenth article of the sailing rules, was not warranted. By that article a steamship under way has permission —only permission—to employ the signals therein named for communication with "a ship which he has in sight." They are not signals allowed in a fog, or other state of the atmosphere, when sight is cut off. Absolute knowledge of the relative positions of the vessel, such as sight only can convey, is a prerequisite to their use. This case well illustrates the great difference between the certain information gained by sight, and conclusions resting on inferences from sound. "There is no such certainty of the exact position of a horn blown in a fog as will justify a steamer in speculating upon the probability of avoiding it by a change of the helm, without taking the additional precaution of stopping until its location is definitely ascertained." The City of New York, 147 U. S. 72, 84, 13 Sup. Ct. Rep. 211; The Lancashire, Law Rep. [1893,] 47; The Bolivia, 49 Fed. Rep. 169, 171, 1 C. C. A. 221; The Nacoochee, 137 U. S. 330, 338, 339, 11 Sup. Ct. Rep. 122.

As the Parthian's fault contributed to the disaster, she must bear a portion of the loss, and the damages must be divided between the two vessels. The owners of the cargo, and members of the crew of the schooner, are parties to the libel, and in the final decree their rights will be adjusted. Costs of this appeal must be borne equally by the parties in fault,—the two vessels.

The decree of the district court is reversed, and the case is remanded, with directions to determine the damages, and to enter decrees as may be required to conform to this opinion.