PALMER et al. v. MERCHANTS' & MINERS' TRANSP. CO.

(District Court, D. Massachusetts. June 18, 1907.)

No. 1,741.

1. COLLISION—SPEED OF STEAMER IN FOG—MODERATE SPEED.

A steamer at sea, proceeding at night in a dense fog, in frequented waters, at a speed of 10 or 11 knots an hour, is not going "at a moderate speed, having careful regard to the existing circumstances and conditions" as required by article 16 of the international navigation rules (26 Stat. 320 [U. S. Comp. St. 1901, p. 2868]).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 170.

Collision rules—speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

2. SAME—HEARING OF FOG SIGNAL AHEAD—DUTY TO STOP.

When the master of a steamer at sea at night in a dense fog heard a single blast of the fog horn of another vessel nearly ahead and apparently only a short distance away, he was not justified in assuming that he could locate the precise position of such vessel, and that he was overtaking her; but it was his duty to at once reverse and go full speed astern until the steamer was stopped and the location and course of the other vessel was definitely ascertained.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 152, 153, 170, 172.]

3. SAME — STEAM AND SAILING VESSELS MEETING — EXCESSIVE SPEED OF STEAMER.

The large schooner Harwood Palmer, while sailing free at night in a dense fog through the South Channel from 25 to 30 miles S. S. E. of Cape Cod light, on a course N. ½ E., came into collision with the steamer Juniata, which was on a course S. S. E. from the Cape Cod light until immediately before the collision. The schooner had reduced sail and was making about three knots an hour, and was sounding three blasts of her fog horn at intervals of one minute. The steamer was also sounding fog signals and was going at a speed of 10 or 11 knots an hour, her full speed being 14 knots, when her master heard a single blast of a fog horn, which he located as one or two points on the starboard bow. He assumed that he was an overtaking vessel, and starboarded his helm and slowed, but the collision occurred within a minute or two thereafter. Held, that the direct and immediate cause of the collision was the immoderate rate of speed of the steamer, which prevented the hearing of the full signals of the schooner and the control of the steamer in time to prevent the collision after the schooner could be seen; a secondary fault being the failure of the master to at once reverse.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 170.

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

**4. ADMIRALTY—PLEADING—UNTRUTHFUL ALLEGATIONS.**

In an admiralty cause, the court has the right to expect substantial accuracy in the allegations of the pleadings, and, if the parties have reason to suppose that their allegations are not true and correct, either before or during the trial they should amend.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Admiralty, §§ 519, 520.]

**5. COLLISION—SUITS FOR DAMAGES—INTERFERENCE WITH WITNESSES.**

In a collision cause, attempts on either side to interfere with or solicit witnesses who are on the other vessel are always looked upon with suspicion by the court.

**6. SAME—STEAMER AND SCHOONER—ALLEGED FAULTS OF SCHOONER.**

A schooner *held* on the evidence not in fault for a collision with a steamer at sea in a fog on the ground of failing to keep a proper lookout or to sound fog signals with sufficient frequency; it appearing by a preponderance of the evidence that she kept her course as she was required to as the privileged vessel, that the master was aware for some time of the approach of the steamer, and that by his orders fog signals, correctly indicating the course of the schooner, were sounded during such time at intervals of not more than 30 seconds.

**7. SAME—ALLEGATIONS OF EXCESSIVE SPEED.**

A schooner which, as a preponderance of the evidence tended to show, was proceeding at night in a fog at a speed not exceeding 3½ knots an hour, *held* to have been going at a moderate speed in compliance with the rules.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 171.]

**8. SAME—LIGHTS.**

A schooner *held* not chargeable with contributory fault for a collision at night with a steamer in a fog, on the ground that her side lights were so located that they could be obscured by the sails, where a preponderance of the evidence tended to negative such claim, and it also appeared that the lights were in fact seen by those on board the steamer as soon as the vessels were close enough together so as to render them visible through the fog.

**9. SAME—CHANGE OF COURSE IN EXTREMIS.**

Whether or not the master of a schooner gave a proper order as to change of course immediately before a collision with a steamer, brought about by the latter's fault in going at an excessive speed in a fog, is immaterial in a suit for the collision, where the error, if one, was one made in extremis, and in any event no change then made could have averted the collision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 225.]

In Admiralty. Suit for collision.

Benjamin Thompson, Edward S. Dodge, and Howard M. Long, for libelants.

Daniel H. Hayne, A. Nathan Williams, and Frank Healey, for respondent.

HALE, District Judge. This libel in personam is brought by the owners of the schooner Harwood Palmer to recover damages alleged to have been sustained by that vessel, by reason of a collision with the steamship Juniata of the respondent company. The collision occurred about 9:50 o'clock on the evening of September 20, 1905, at a point off the Atlantic Coast in the so-called "South Channel," from 25 to 30 miles S. S. E. of Cape Cod light. The hearing of the case

before the court occupied more than 30 days. The record covers more than 6,000 pages.

The Harwood Palmer is a five-masted schooner of the burden of 2,885 gross tons. She is 301.7 feet long, 46.3 feet beam, 27.8 feet deep. When loaded, she draws about 26 feet 6 inches aft. At the time of the collision, she was on a voyage from Baltimore, Md., to Portland, Me., with a cargo of 4,425 tons of coal. She was then drawing 26 feet forward and 26.6 feet aft. She had on board a crew of 13 men all told, consisting of a master, two mates, engineer, eight seamen, and steward. The steward's wife was also on board. The schooner sailed from Baltimore on the 14th of September, 1905, and continued on her voyage until September 19th, when she came to anchor off Handkerchief Lightship, Nantucket Shoals, and remained there until about noon of the next day, September 20th, when she got under way and proceeded on her voyage through the Round Shoal Passage. The testimony in her behalf shows that she continued to carry all her sails until about 4 o'clock in the afternoon, when the fog came in; that her mechanical fog horn was then placed on the cavil of the double bitt and blown three blasts at a time up to the time of the collision; that about 5:30 she passed the whistling buoy and came into the South Channel; that a light and baffling wind was blowing from S. by W. to S. S. W., and there was a moderate swell; that the schooner's course was changed to N. E. ½ N., and her patent log was put over; that about 6 o'clock her fore, main, mizzen, and jigger topsails were clewed up, her spanker topmast staysail was hauled down, the clews of the other three staysails were hauled up so that none of them were drawing, leaving only her lower sails and the spanker topsail set. It is claimed that this diminished the driving power of her sails about one-fifth, and that this precaution was adopted on account of the weather continuing thick, the master desiring to reduce her speed as she was running free and was the burdened vessel in meeting and passing sailing vessels going out of the South Channel, and that her speed was only about enough to give her steerage-way; that after this she was making about three knots an hour, and logged 13 miles from 5:30 in the afternoon to 9:50, the time of the collision. Her testimony further shows that at sunset her lights, which were the largest used on vessels of her class, were lighted and properly set on screen boards in the main rigging; that from 8 o'clock until the time of the collision her starboard watch was on deck, the watch consisting of Capt. Creighton, the second mate, Charles McLaughlin, and four seamen; that the captain was in charge of the watch, the second mate and two men were in charge of the deck, Peter Bento was at the wheel, and Peter Santos was on the lookout and blowing the horn; that at 9:20 the captain gave orders to jibe the schooner—that is, swing the booms over onto the starboard side—which order was completed before the collision; that the schooner's course after the last change and at the time of the collision was N. ½ E., that being her course from the point where the change was made. The testimony of those on board the schooner is that the wind at the time was light, from S. S. W. to S. W. by S., the night was still, and that a dense fog prevailed.

The Juniata is a single-screw steamer of the burden of 2,551 gross tons, 270 feet long on the water line, 292 feet over all, 42 feet beam, 16 feet deep, drawing from 16 to 20 feet. She is owned by the respondent corporation, and operated as a passenger and freight steamer on a regular line between Boston, Baltimore, Norfolk, and Newport News. The testimony of her master and first officer shows that on September 20th, about 3:47 in the afternoon, she sailed from Boston for Norfolk, in good weather, in charge of Capt. Nickerson, a mariner of skill and of an experience of 43 years; that she was staunch, strong, well equipped and manned, laden with a miscellaneous cargo, and carrying a passenger list of about 50 persons; that about 5:30 her lights were properly set, and were brightly burning up to the time of the collision; that, after passing Cape Cod, fog threatened, and it was deemed best to avoid the inside course through Pollock Rip Slue and the heavy traffic using that thoroughfare, the captain testifying that he uses South Channel in thick weather, and saying: "It looked to me as though it was going to be foggy weather, and, the wind being to the southward like, I thought I would go out South Channel, instead of going down Pollock Rip, as there is so many more vessels there, and there is a big chance for a collision;" that the course of the steamer was S. S. E. from her departure, four miles off Cape Cod; that from about 8:25 p. m. till the time of the collision the steamer's fog signals were properly and continuously blown at intervals of a minute; that at 8:39 in the evening her engines were slowed; the captain testifying that the fog was very dense just then, and that he made the remark to his first officer: "This is getting too much for my stomach;" that while passing through this "bunch of fog" a horn was reported by the lookout and heard by those in the pilot house, broad on the port bow, and a long distance off; that several minutes after entering the fog the steamer emerged from it, and, after a consultation with the first officer, the steamer's engines were put ahead; that when the fog signal was started at about 8:25 in the evening the engineer in charge cut down the steam pressure 15 pounds, so that, instead of her prior speed of 14 knots, the Juniata was making, as the captain testifies, "10 or 11 knots;" that after running about 25 miles on a course S. S. E. from Cape Cod light, the lookout reported "horn on the starboard bow;" that only one blast was heard by the lookout or by the captain and first officer; that this blast was estimated by the observers on the steamer to have been one or two points on her starboard bow; that immediately her helm was put hard to starboard, the engines were slowed, and were so kept until the time of the collision. The answer sets out that:

"Shortly after starboarding, the oncoming schooner was discovered approaching rapidly, bearing down upon the Juniata apparently with all sails set, and the Juniata's engines were immediately stopped and reversed full speed astern. The schooner struck the Juniata with her jib boom and bowsprit with shattering force on her starboard bow."

I will later discuss the two conflicting accounts of the collision given by the contesting parties.

1. The libelants allege as the principal fault of the steamer that she was proceeding at an immoderate rate of speed in a fog.

It is agreed that the collision took place in the South Channel, which, as Capt. Nickerson testifies, extends from Pollock Rip light to the South Shoal lightship. It is necessary to consider to what extent the South Channel at the point of collision is frequented by vessels. Capt. Nickerson testified:

"Q. When and why do you use the South Channel, so called?
"A. I never used South Channel unless it was thick weather or a snow-storm.
"Q. Are you familiar with the class of shipping that uses the South Channel?
"A. Yes.
"Q. Describe it.
"A. Almost all large vessels use it one way or another—schooners, big schooners, steamers, tramp steamers in and out, other steamers. Fishing vessels go down there in the lower part, what we call down in the fishing rip; and also sometimes some small schooners get blowed off there through stress of weather, but they don't use is voluntarily—the small vessels—except fishermen."

Other witnesses for the respondent testify to the frequent use of South Channel by large vessels, especially in a fog. The whole testimony upon this point is to the effect that large, deep draft vessels go through the South Channel, and this is especially true in thick weather; that the large fore and aft vessels which have recently come into use frequent these waters, as do many fishing vessels. From the great preponderance of the evidence, I have no question that the collision took place in a thoroughfare frequented by deep draft vessels, especially in foggy weather.

What was the condition of the night in respect to fog? All those on board the schooner testify that a dense fog prevailed at the time of the collision from as early as 8 o'clock up to the time of the collision. Most of them agree that the fog was so dense that objects could not be seen for a much greater distance than the length of the vessel, and that the fog was thicker at the time of the collision than it was earlier in the evening. Capt. Creighton says that, at the time of the collision, the fog was thick; that, having heard the whistle of the Juniata, he was watching; and, on being asked how far the vessels were apart when he first caught sight of the Juniata, he says: "They were a little less than twice our length." Most of the schooner's crew say that you could see her about the schooner's length. Santos, the schooner's lookout, says the fog was "as thick as it could be." A passenger upon the steamer testifies that, shortly before the collision, when he went to his stateroom, he could not have seen the figure of a man from one end of the vessel to the other, on account of the fog, if the man was not standing by a light. He testifies further that, as night came on, the fog seemed to him to grow thicker. He says that when the collision took place he came on deck, and the fog was very thick at that time. Webster, the steamer's lookout, says that at the time the vessels struck it was a thick fog, and that when he came out on the lookout deck at 8 o'clock the fog would have prevented him from seeing a man clearly in the stern of the steamer, and it was thicker at the time of the collision than it was at 8 o'clock. He says that when he first saw the jib boom and head sails of the schooner come out of the fog they were "as

far as the length of this room," which it is agreed was about 25 or 30 feet. I have already referred to the testimony of Capt. Nickerson in reference to running into a bank of fog at 8:39. In reference to this I asked him :

"Q. How long do you say you were in that bunch of thick fog, as you call it?"

To which he answered:

"A. At the end of four minutes I judge you could see half a mile or more, from the time I slowed down. I might not have slowed till I might be, in it a minute; wanted to see if I would run through, as we usually do."

He says that they continued under the order "ahead slow" until 8:43, when he rang her ahead; that during the entire evening he had no talk with the lookout as to the distance at which he could see vessels, nor as to the character of the fog. He testifies:

"I didn't ask Webster whether he found the fog thick or thin down there. I didn't care what he thinks. I am not taking his judgment in running the ship."

The evidence of the master as to the character of the fog and the distance he could see is corroborated by the first officer. Both these officers appear to have based their judgment largely upon the way the winkers or whiskers appeared around the side lights and the masthead and range lights. The testimony of many of the expert witnesses is to the effect that an attempt to determine the density of the fog in this manner is unsafe and in many respects delusive. The contention of the officers in these particulars is not corroborated by any of the steamer's passengers, or by other members of the crew, although it appears that many of them were on deck immediately after the collision, and the steamer was stopped in the fog for several hours within a mile of the schooner. The testimony of the captain and first officer of the steamer does not satisfy me that a vessel could be seen for half a mile at the time of the collision, or for an hour before the collision. The preponderance of the evidence on this point is that the fog was dense. I must come to the conclusion, then, that the collision occurred in frequented waters and upon an evening when a thick fog prevailed. It is unnecessary for the purposes of the case to decide precisely how thick the fog was. It was clearly so dense as to warn a prudent shipmaster that he was encountering risks, and that he should reduce his speed to such a rate as would enable him to stop in time to avoid a collision with an approaching vessel, after such vessel should come in sight, assuming that such approaching vessel was proceeding at the moderate rate of speed required by law.

Capt. Nickerson admits knowledge that the sailing rules require a steamer to proceed moderately in a fog. He is then asked:

"Q. What do you understand moderate speed in a fog is?"

And answers:

"A. Two or three knots less than she can go when she is going as fast as she can go."

The first officer says that he understands moderate speed to mean running under reduced pressure; that he thinks in a fog, as they were

that night, 10 or 11 knots would be moderate speed; and that, as near as he can make out, the speed of the steamer at the time the horn of the schooner was first heard was 11 knots.

Article 16 of the International Rules for Preventing Collisions at Sea provides that:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions." [U. S. Comp. St. 1901, p. 2868.]

I have already referred to the frequented thoroughfare of the South Channel, and to the foggy condition of the night. Taking these as "existing circumstances and conditions," was the speed of the steamer "moderate speed"? The expression "moderate speed" is relative. No fixed rule can be laid down. The speed of a ship must be regulated by the density of the fog, the danger of meeting other vessels, and her own ability to stop. The test of moderate speed is given in The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 615, 41 L. Ed. 1053, where Mr. Justice Brown says:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

The Supreme Court again recites the same rule in The Chattahoochee, 173 U. S. 540, 548, 19 Sup. Ct. 491, 494, 43 L. Ed. 801.

In The Etruria, 147 Fed. 216, 218, 77 C. C. A. 442, 444, in referring to the speed of the offending steamer in a fog, Judge Wallace said:

"However that fact may have been, her speed was excessive if it was true that she could not reverse her engines and come to a standstill before she should collide with a vessel which she ought to have seen."

He also cites The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687.

In The Cambridge, 2 Lowell, 21, 23, Fed. Cas. No. 2,334, Judge Lowell said:

"It is useless to cite the many cases which show what is a moderate rate of speed for a steamer in a fog. No general rule has ever been attempted to be laid down but this: That the speed should be such as will enable the steamer to avoid the other vessel after she shall be able to make her out. This test may seem a little too much like deciding each case by the event, and holding any speed too great where there has been a collision; but it has been adopted by high authority, both here and in England."

In The Louisburg, 75 Fed. 424, 21 C. C. A. 424, Judge Webb said:

"The suggestion is, and the expression of opinion is, that it would be possible to bring this steamer, loaded as she was, to a standstill in about one length, and her own length is 87 yards (261 feet). With this measurement and estimate, for a vessel to be proceeding in a fog as thick as that was, at a rate of speed which would prevent her being brought to a standstill certainly within the distance within which a vessel could be seen, or which would prevent her from taking such necessary steps as might become necessary for the protection of the vessel which she was to keep clear of, I hold was too fast. I do not think that any so safe rule can be laid down to determine and interpret what can be meant by moderate speed in the fog, as that rule which says such rate of speed as gives the party the necessary con-

trol for discharging his obligation to other vessels if he came upon them; and that, manifestly, in this case, he could not do."

In The Eleanora, 17 Blatch. 88, Fed. Cas. No. 4,335, Judge Blatchford said:

"The steamer was running at the rate, at 5½ miles an hour, of 484 feet in a minute. The wind was blowing the sound of the whistle directly away from the schooner. * * * If the steamer had been going at less speed, or had gone ahead a short distance and then stopped still and listened, and thus made her speed, or her passage from point to point through the intervening space, and not merely her running rate while in forward motion, that 'moderate speed' which the statute requires, it is quite apparent that, blowing her whistle continually, at proper intervals, the blast would have been heard by the schooner, and answered by the fog horn over the starboard side of the schooner, in sufficient season for the steamer to have stopped and backed, and be brought to a standstill, before reaching the schooner. Therefore the steamer was in fault as to her speed."

In confirming the opinion of Judge Blatchford, at page 100, of 17 Blatch. (Fed. Cas. No. 4,335) Mr. Chief Justice Waite said:

"I have had no difficulty in reaching the conclusion that both vessels are responsible for this collision. A simple slackening of speed by a steamer in a fog is not always enough. She must run at a moderate speed (Rev. St. § 4233, Rule 21 [U. S. Comp. St. 1901, p. 2898]), and is never justified in coming in collision with another vessel, if it be possible to avoid it (Sup. Ins. Rule 4). This implies such a speed only as is consistent with the utmost caution. Having complete control of herself, and being capable of so much damage if a collision does take place, the law has imposed on her the obligation of so directing her own movements, in the midst of the uncertainties of a fog at sea, as to be at all times under easy command. If she fails in this, she must suffer the consequences. Her rate of speed must be graduated according to the circumstances. The more dense the fog, the greater the necessity for moderation. The object is to keep her, if possible, under such control that she can be stopped after another vessel, with which she is in danger of collision, may be seen, or otherwise discovered. She has the right to assume that other vessels will perform their duties and act accordingly, but she has no right to disregard any obligation placed on herself."

In The Martello (D. C.) 34 Fed. 71, 74, Judge Brown said:

"If the fog was so thick that the Willey could not be seen more than from 250 to 700 feet, as most of the Martello's witnesses testify, her speed was not 'moderate,' within the decisions, because she could go slower, and it was impossible, with that speed, to avoid any approaching vessel within that distance."

In The Parthian, 55 Fed. 426, 432, 5 C. C. A. 171, 176, in speaking for the Circuit Court of Appeals, Judge Webb said:

"No order to slacken the speed of six or seven knots, or to stop and reverse, was given till the vessels were so close upon each other that immediately after it was given the schooner appeared out of the fog, crossing the bow of the steamer, with, as the master says, 'scarcely any distance between them.' From the moment the steamer entered the fog to the collision, she was in the wrong. Save in the one particular of giving prolonged blasts with her whistle, she wholly failed to observe the requirements of the statute. Even if she had gone at half speed, which was too fast in that fog, at the place she was, this collision would not have occurred; much less if her speed had been moderate."

In McCabe v. Old Dominion Steamship Co. (D. C.) 31 Fed. 234, 237, Judge Wales said:

"The general rule is that a steamship should always be under such control as to be stopped and reversed within the distance at which an approaching vessel can be seen."

In Marsden on Collisions (5th Ed.) 373:

" 'Moderate' speed is a relative term. * * * It may be stated as a general rule, that speed such that another vessel cannot be seen in time to avoid her is unlawful." The Bolivia, 49 Fed. 169, 1 C. C. A. 621; The Jane, 11 Law Term (N. S.) 5; The Western Metropolis, 7 Blatch. 214, Fed. Cas. No. 17,441.

The Juniata was proceeding in South Channel on a foggy night at a speed of not less than 10 to 11 knots an hour. It is urged by the libelants that the weight of the testimony is that her speed was much greater than 11 knots; that the location of the collision made by Capt. Creighton, and the location estimated by Capt. Nickerson at the time of making his wreck report, a few days after the collision, placed the steamer at the time of the collision at about 30 miles S. S. E. of Cape Cod; and it is urged that, if that were her location, her speed must have been between 13 and 14 knots at that time. There is force in the contention that her speed must have been more than 11 knots; but I will proceed upon the assumption that it was from 10 to 11 knots, as admitted by her officers, although it does not appear by their testimony that they had any definite knowledge upon the subject. She was, then, proceeding at this rate, under the conditions to which I have referred. Her officers are assumed to have been familiar with articles 20 and 21 of the sailing rules, which provide:

"Art. 20. When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel.

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed." [U. S. Comp. St. 1901, p. 2870.]

Her master, Capt. Nickerson, knew also his duty of proceeding under moderate speed according to the provisions of article 16, and he testifies that he thinks the steamer could have been stopped at a distance at which another vessel could have been seen. Shortly before the time of the collision, the captain says he heard a signal, one blast of a fog horn, which he located at about a point or two points on his starboard bow. That blast of the fog horn indicated a vessel on the starboard tack whose course was away from the Juniata, making the Juniata an overtaking vessel. Whereupon he starboarded his helm and slowed the steamer, at 9:47 p. m. Her engines were kept slowed down for a minute until 9:48 p. m., when the sails of the oncoming schooner were discovered on the starboard bow, about where the one blast indicated. He estimates the schooner's sails as about 500 feet away when she came out of the fog about one minute after the schooner blew the one blast, which he says is the only blast he heard from the schooner. He says that then the steamer blew two blasts to indicate to the schooner the steamer's direction. The learned proctors for the respondent from this point further tell the story of the collision as follows:

"The Juniata had by this time swung towards port on her starboard helm about 1½ points, and her swing towards port was stopping. Her speed had

come down, due to slowing and the heavy angle drag of her rudder, to about six miles per hour. When the schooner's sails were seen, they were estimated to be about 500 feet away, and at that time, which was about one minute after the schooner blew the one fatal blast, the steamer blew two blasts on her whistle 'to indicate to the schooner the steamer's direction. The schooner's red light then suddenly came into view, as though it had come out from behind something, and showed strong. While the captain was rapidly formulating what he should do, the green light of the schooner opened up strong, showing both lights to the steamer. The steamer was immediately reversed full speed for about half a minute to a minute before the contact. At the time of contact the steamer's speed under her reversed engines and· heavy angle drag of her rudder had been reduced from six miles to two miles. The period from slow to reversed engines and reversed engines to the collision is conservatively estimated by those 'on the steamer at one minute slowing, and one-half minute to one minute reversing. * * * After the Juniata reversed, which canted the Juniata's bow toward starboard, the schooner was seen to be still approaching the Juniata, and continued to do so until the end of her jib boom was observed by those in the steamer's pilot house to come in over the rail on an angle of about three points; the end of the jib boom coming straight toward the pilot house. The schooner's speed was not thus checked, and she continued to come on, raking the starboard side of the pilot house and adjoining staterooms, and curving some towards her port hand. Under the action of her wheelsman, she turned her starboard side toward the Juniata and struck the Juniata's starboard side with her starboard anchor, inflicting at regular periods on the Juniata's side three distinct groups of perforations and indentations with her anchor, until the anchor broke away."

On the other hand, the libelants tell their story substantially as follows:

That when the fog came on early in the evening the sail area of the schooner was reduced about 20 per cent., and that, during the whole evening, and at the time of the collision, she was proceeding moderately, not over 3 or 3½ miles an hour; that the schooner was properly manned and equipped, sounding three blasts of her fog horn at intervals of not more than a minute between the groups, indicating the fact that she was sailing free, with the wind abaft her beam; that she held her course up to the moment of the collision, when her wheel was starboarded; and that such maneuver tended to avert the collision. The libelants also contend that, at the time when the steamer's watch heard one blast of the schooner's fog horn, there was actually a group of three blasts blown, and that such groups had been blown regularly from sunset until the time of collision, at intervals of not more than a minute, and, for the last few minutes, at closer intervals; that when those upon the steamer heard the blast of the schooner's fog horn, they were prevented from hearing the three blasts by the excessive and immoderate speed of the steamer and the noise made by her as she proceeded through the water; that at the time of hearing the schooner's horn she was nearly ahead, and so close that the collision occurred not over a minute from that time; that, hearing the schooner's horn and seeing her sails and lights, all occurred very suddenly as is shown by the exclamation of Mr. Jones: "My God! there are her lights;" Capt. Nickerson replying: "I see them;" that upon hearing the horn he should have immediately reversed full speed astern for the purpose of bringing the steamer to a· standstill as soon as possible, and should have ported her helm in order to pass under the schooner's stern; that, at the time, the steamer was proceeding in a dense fog at an immoderate rate of speed and taking no precautions in the way of doubling the lookout; that the lookout was incompetent, stationed at an improper place upon the ship, and that the navigating officers were in the pilot house, which was unfavorably situated for the prompt hearing of sounds; that, after the schooner's horn was heard, little change of course took place before the vessels came together; that it was gross negligence for the master of the steamer, proceeding in the manner described, to assume that upon hearing

one blast of the horn he had correctly located its bearing or the number of its blasts; that the one blast of the schooner's horn which was heard was one blast of the last group of three blasts, blown as described; that the only time one blast was blown was just as the vessels came together, when the lookout blew a single blast and did not have time to finish the others of the group, but ran, in great fright; and that this one blast was never heard by the steamer; nor were the hails from the schooner given at the same time heard by those on the steamer, except Capt. Nickerson.

It is not necessary to decide whether the collision happened exactly as described by either of the parties to the suit. I can have no doubt, however, that the estimation of intervals of time on the part of the respondent is exaggerated. I do not believe that, from the time when the steamer heard the first blast of the schooner's horn until the vessels actually came together, so long a time elapsed as is estimated by those upon the steamer. I think the steamer has committed the usual error of largely overestimating the lapse, of time consumed in the happening of events during the exciting moments while the vessels were coming together. I think the estimates of time upon the part of the libelants are more nearly correct.

Taking into consideration the frequented character of the waters and the density of the fog, I can have no doubt that the steamer's admitted rate of speed, from 10 to 11 knots an hour, was not "moderate speed." I believe that her speed may well have prevented her from hearing the sounds of the fog horn of the schooner, for, from the great preponderance of the evidence, I can have no doubt that the horn was blown as testified to by the captain, the officers, and most of the crew of the schooner. When the master of the steamer heard the fog horn of the schooner, it was clearly his duty to reverse his engines promptly and go full speed astern. In the nighttime, in a thick fog, under such circumstances, the navigating officer of a steamer is not justified in assuming that he has fixed the precise location of a horn, when he has heard only one blast, and when the sound must have appeared so near to him as it did on the evening of the collision. In such a situation, he should not rely upon locating an approaching vessel by sounds alone, but should reverse his engines and come to a stop as soon as possible.

It may be said of this case, as in the case of The Parthian, supra, where Judge Webb observed:

"This case well illustrates the great difference between the certain information gained by sight and conclusions resting on inferences from sound. 'There is no such certainty of the exact position of a horn blown in a fog as will justify a steamer in speculating upon the probability of avoiding it by a change of the helm, without taking the additional precaution of stopping until its location is definitely ascertained.'"

And the court may well say here, as Judge Lowell said in the case of The Cambridge, supra:

"It is to be regretted that he did not then reverse his engine, and wait until he was sure whether he ought to go to port or to starboard."

Even if Capt. Nickerson had reversed and gone full speed astern when he heard the horn, it is quite likely that he could not have escaped the collision. Indeed, he has testified that, if he had done this,

he could not have brought his vessel to a standstill before the schooner got to the steamer. But he had brought himself 'to this position by his immoderate rate of speed, and I cannot escape the conclusion that by such immoderate speed he prevented himself from hearing the sounds which he ought to have heard, and placed himself in a position where he could not avoid collision with the schooner as soon as he saw it. In fact, upon his own testimony with regard to the intermittent and variable fog conditions earlier ·in the evening, he was clearly proceeding recklessly. His estimates as to his maneuvers, as well as to his speed, afford the court very little assistance in coming to a conclusion. He says he was proceeding at a moderate speed, but his idea of moderate speed is "two or three knots less than a ship can go when she is going as fast as she can." His first officer frankly states that he regards 10 or 11 knots as moderate speed in the weather conditions of ·such an evening as that in question. And one of the witnesses for the steamer says in regard to sailing rules:

"They are not always carried out. * * * I think my judgment is better than a lot of countrymen sitting up making those rules that know nothing about navigation."

In The Cambridge, supra, Judge Lowell administers a proper rebuke to officers of steamers who think they are called upon to take the place of the court in construing the laws of the United States in relation to the speed of vessels in a fog. He says:

"I have often had occasion to say that the owners and masters of steamboats must either comply with the statute, or procure its repeal. It is impossible for the courts to overlook a plain breach of the written law, upon any considerations of hardship in its application."

In The Blackstone, 1 Lowell, 485, 490, Fed. Cas. No. 1,473, in considering the same subject, Judge Lowell remarks:

"I should be glad to see the experiment tried by a steamer, of moderating her speed in a fog; but I have hitherto found that their managers do not consider it to be important."

In The Cambridge, supra, Judge Lowell further considers the question of immoderate speed in a fog, and the secondary faults which result from that as a primary fault. He says:

"It has been ruled very often that, however unavoidable a collision may have been when the vessels first saw each other, it is their duty to take every possible precaution not to be brought into such a position."

I am clearly of the opinion that the act of Capt. Nickerson in running at an immoderate speed in the fog was the primary and efficient cause of bringing the vessels into such position, when they first came ·in sight of each other, that it was impossible to prevent the collision. The speed in the fog was, then, the initial cause of the collision. As I have indicated,. I am also of the opinion that it was the duty of the master of the steamer to go full speed astern and to stop as soon as possible when he' first heard the horn of the approaching schooner; but this was a secondary fault. It is not necessary for me to decide whether he was guilty of faults with reference to his lookout, or of any other faults pertaining to his vessel; for the primary and controlling fault was the excessive speed of his steamer in the fog. Im-

moderate speed in the fog was, then, in my opinion, the direct and immediate cause of the disaster, in that it prevented the hearing of the signals of the approaching schooner, and in that it placed the steamer beyond control. The whole evidence, taken together, instead of relieving the steamer of the burden placed upon her by the law, tends rather to confirm it.

In considering this aspect of the case, I find that certain exceptions have been raised upon it, as well as upon some other parts of the case. I have not found it necessary to pass upon these exceptions in detail. Most of them relate to answers to interrogatories, and to certain alleged faults in pleading. One of the leading questions raised in the matter of answers to interrogatories is this: In one of such answers, the respondent alleges that, at the time of first hearing the horn, the Juniata was running slow. And again the respondent states that, in consequence of hearing the horn, the steamer's helm was starboarded, and that she kept away, and that the engines had been previously slowed. And again, as bearing upon the subject of the speed, the allegation is made that the Juniata ultimately moved out of sight of the schooner, and that she was backing away, instead of proceeding by forward movement. I find no testimony whatever in the record tending to show that the steamer was backing away. Capt. Nickerson, the navigating officer, positively stated that he never claimed that his ship was backing away at the time of the collision. Nor is there any testimony that the engines had been previously slowed at the time of his first hearing the schooner's horn. Capt. Nickerson, in fact, says he does not remember ever making any statements which could have been the basis of such allegations in the pleadings. I think this matter requires a word of comment from the court.

In the M. M. Hamilton, 1 Hask. 489, Fed. Cas. No. 9,685, Judge Fox adverts to the duty of a proctor to so draw his pleadings as to advise the other party of the facts which he will be called upon to answer. Judge Fox always insisted that the rules, which make it incumbent upon a party to propound his facts in an articulate and orderly manner, bound him primarily to propound them in a truthful manner. He always urged upon counsel practicing before him the duty of amending pleadings, if at any time in the progress of the trial it became evident that such pleadings did not set forth facts correctly and truthfully.

In an admiralty cause, parties are not expected, and in fact are not allowed, to make any considerable departure from the deliberate allegations in the pleadings. The court has the right to expect substantial accuracy in libel and answer. If the parties have reason to suppose that their pleadings are not substantiallly correct, they have the full power to amend at any time before trial, and, in fact, during the progress of the trial. I make these general observations in regard to the pleadings, as there was some sharp contention of counsel during the progress of the trial relating to the exceptions.

2. The steamer accuses the schooner of fault in reference to fog signals and in having a defective lookout.

As the duty of the lookout of the schooner was also to blow the horn, I will consider these allegations of fault under one head.

Article 15 (c) of the International Rules for Preventing Collisions at Sea provides:

"(c) A sailing vessel· under way shall sound, at intervals of not more than one minute, when on the starboard tack, one blast; when on the port tack, two blasts in succession, and when with the wind abaft the beam, three blasts in succession." [U. S. Comp. St. 1901, p. 2880.]

Article 29 provides:

. "Art. 29. Nothing in these rules shall exonerate any vessel or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." [U. S. Comp. St. 1901, p. 2884.]

The respondent contends that both of the above provisions have been violated by the schooner, in that, while the schooner was sailing with the wind abaft the beam, the lookout blew one blast of the horn, thereby deceiving the steamer and leading her to believe that the schooner was sailing on the starboard tack, and the steamer was overtaking the schooner; and that there was fault on the part of the schooner, in that the lookout was absent from his post at a time when he should have been blowing the horn; and that his attentions were divided by the duties of assisting in jibing, at a time when he should have been blowing the horn.

All, or nearly all, of the crew of the schooner testified before me. They are, for the most part, colored people, many of them from the Cape Verde Islands. They are of about the average intelligence of men of their class. On this question much depends upon the testimony of Capt. Creighton, the master of the schooner. He is a man 44 years old. He has had 27 years' experience at sea. He has been master of a vessel for 22 years. He has sailed in square-rigged vessels and in large schooners. As much depended upon his testimony, I watched him with great care and attention, and several times I personally questioned him. He gave me the impression of a faithful and truthful man. The collision occurred during his watch on deck. He testified that his schooner got under way from her anchorage near Handkerchief lightship about noon on Wednesday, September 20th; that it shut in thick about 4 o'clock; that they then "brought the fog horn up and commenced blowing it three blasts"; and that "the intervals between the three blasts were not over one minute." He produced his fog horn in court. I went upon his schooner and heard the horn tested. The captain testified with apparent correctness that it makes "a good loud noise, as good as any horn I ever heard." He testified that after 8:55 he was constantly on deck, and did not go below at any time before the collision; that he heard the horns of two sailing vessels and the whistle of one steamer before he heard the whistle of the Juniata; that at 9:40 he heard the Juniata's whistle bearing about N. by W. ½ W. about two points on the port bow; that it seemed to him very far distant; that at 20 minutes after 9 he had given orders to the second mate to jibe the sails over from the port to the starboard side; that this was done, and the course of the schooner was then shaped N. ½ E.; that the wind was then S. W. by

S. to S. S. W. "light breeze, thick fog"; that when he first heard the Juniata's whistle the spanker had been jibed over, and the crew were shifting over the boom tackles and clearing up about the decks; that the first sound of the whistle was "very faint and difficult to hear," and he barely made it out, although he has very good hearing, and has had great experience in the matter of hearing sounds; that, during all the time until the Juniata herself broke out of the fog, he was paying strict attention; that he was watching and listening for the steamer during all that time; that his mind was not turned to any other subject; that he was watching for the appearance of the steamer, and he was doing this because he "was in a dangerous position." He also says that he had to look out for all vessels by the wind, and they were directly in the track of close-hauled vessels beating down South Channel. In less than two minutes after hearing the first faint sound, he testifies that he heard it a second time, "a little louder than the first time," and, as the weather was thick, he "judged she was bound out the South Channel;" that, after he heard the sound of the whistle of the Juniata the first two times, he soon afterwards heard her the third time; that he concluded that his schooner was directly in the course of the steamer; that he then said to the man at the wheel: "That steamer is coming straight for us. Keep her straight;" that at the time when he first heard the whistle the schooner's fog horn was blowing at "intervals of not over 50 seconds;" that when he heard the whistle he hollered: "Keep the horn agoing;" that then the blowing of the horn quickened up, and it was blowing at intervals between the groups of three blasts of not over 40 seconds until two or three minutes before the collision, when, in his intense anxiety, he shouted: "Blow the horn oftener." And from that time it was blown at intervals of not over 20 seconds between the groups; that he gave this order, not because there had been any failure before that time to blow the horn as frequently as he has described, but for the reason which he gives that, "judging by the increasing sound of the steamer's whistle, I judged it was coming very fast and would pass close aboard, and I was very anxious to give him all the notice possible of our position." After this last order to the lookout, he says the schooner's horn was blown three blasts four or five times before the collision; that, in the ordinary practice at sea, it requires 15 to 20 seconds to blow a group of three blasts as required by the sailing rules for a vessel with the wind abaft the beam; that after he sung out to the lookout, "Blow the horn oftener," there was an interval of not more than 20 seconds between the groups of three blasts; that there was no cessation from the time of blowing the horn in that manner before the collision; that had there been he would have noticed it. He testified: "The steamer seemed to be rapidly approaching us, and I was very anxious that the horn should be kept going;" that he judged from the sound of the approaching whistle that the steamer was "coming very fast," and, in view of the manner and speed of her approach, that she had not located the schooner; that he thought the steamer to be about two miles distant when he first heard it, and that she was coming full speed. He gives this as the reason for being very anxious that the horn should be

heard as soon as possible, and for making unusual exertions to discharge his duty to the steamer. He testifies that he took his speed from the log, and it was three knots per hour, and that the wind was light, the fog thick. His testimony is given with great detail and distinctness as to his speed. He says he read the log when they passed Great Round Shoal whistling buoy, and again just after the collision, and that his speed from actual time and distance was about three knots. The question was asked him: "When did you form the judgment in your mind, if you did form any such judgment, that she would be likely to hit you?" And his answer was: "About a minute and a half before the collision, or two minutes, I felt sure of it then; she was coming straight for us." He further says: "I ran forward to the main rigging, port side, so I could get a sight of the steamer as soon as it would be possible to see her;" and then that he stood forward at the port main rigging when the steamer came out of the fog; that up to this time he had heard the whistle of the steamer six or eight times; that just about the time of the collision, just a few seconds before the collision, perhaps five or six seconds, the steamer blew two or three blasts, and after that he heard the one blast of the schooner which the lookout blew and did not have time to finish the other blasts; that this one blast of the schooner was immediately after the two short blasts of the steamer. Mr. Rawding, the mate, was in his room located on the port side of the after house, some 50 or 60 feet forward of the schooner's stern. The window of his room was open. He heard the whistle of the Juniata blown one blast five minutes before the collision, and heard her whistle four or five times in all. He testifies that she blew two blasts just as she was striking the schooner, and just as he got on deck; that he heard the fog horn of the Harwood Palmer blowing groups of three blasts at intervals of half a minute to a minute, not longer than a minute. A few minutes before the collision he heard Capt. Creighton give the order to blow the horn oftener, and after that the intervals "were a little quicker," not over thirty seconds between the groups. McLaughlin, the second mate, also corroborates the captain as to the blowing of the horn up to the time of the collision. He also heard the Juniata blow the two blasts just before the collision, when about 100 to 250 feet away, and he says the one blast of the horn of the schooner was blown after the two blasts of the Juniata's whistle. There is full corrobora'ion of the captain as to the blowing of the blasts of the schooner without interruption up to the time of the collision. This corroboration is made by substantially all the crew, except Santos, the lookout. Thirteen witnesses on the part of the schooner agree that, from 8 o'clock until the vessels came together, the fog horn of the schooner was blown in groups of three blasts, at intervals of not more than one minute; and that, during the last few minutes before the collision, the intervals between the groups were not more than half a minute; and that, when the vessels were coming together, the lookout had time to blow only one blast of a group of three blasts.

The learned proctors for the steamer urge that Santos, the lookout, was at fault in having three duties to perform, namely, looking out,

blowing the horn, and working on the jibs, and that he was also in fault for failing to report the steamer, and in being away from the lookout and from the horn at a crucial time, just before the vessels came together. They took his statements, also two depositions, and finally produced him as a witness during the hearing of the cause. It appears that the Harwood Palmer arrived in Portland September 22, 1905, and the libelants claim that the crew were not paid off for the voyage until Monday afternoon, September 25th. At that time only three men were discharged from the vessel, and the other seamen were reengaged to remain upon the Palmer to go upon the next voyage, "in order to keep the material witnesses for the schooner together." While the schooner was lying at Portland, one of the counsel for the steamer came to Portland and engaged one Quinn, a constable, to go upon the schooner to secure the addresses of the crew, and to obtain statements from them as to how the accident happened, and get an interview if possible. Quinn says he was given no instructions by counsel for the steamer as to the methods he should pursue in getting the statements and procuring an interview with the seamen, but was left entirely to his own resources; that he went to the office of the lawyer whom he supposed to be counsel for the schooner and did not find the men there; that he then went to the shipping commissioner's office, found the crew had not been paid off, but were still on the schooner. Then he testifies: "I took my own method of finding out a few things. I got some clothing samples and started for the ship." He met two of the Palmer's crew coming ashore. He says: "From them I learned that the sailors had been paid off, and I endeavored to sell them some clothing. I came down town with them, and they smoked a few cigars, and I went up to the hotel and reported." He was then furnished with a list of questions to be put to the schooner's crew. Without undertaking to follow the matter in detail, it appears that Quinn carried the samples aboard the schooner and got into communication with the crew. He says he found out that Santos, Bento, Cardoza, and some other men had engaged to stay by the schooner, and that her officers considered their evidence such that they wanted to retain them; that he knew the reason why they wanted them to stay by was because the officers wished to obtain their evidence; that he reported that he found the crew were all niggers, and he says: "I felt I could get them." He admits that he deceived the crew into supposing he was a peddler; that he attempted to get them to make statements to counsel for the steamer, giving intimations that their time, at least, would be paid for. Santos testifies that, at the time Quinn found him, he was living on board the Harwood Palmer, was getting food on the vessel and was working there; that on that day the mate had made him mad; that the mate had let some others go ashore and would not let him go ashore, but, he says: "He keep me on board and make me and another fellow work all that day." He testifies that he had agreed to stay by the vessel and go on the next voyage, but he says: "When I see the mate treat me like that, and let one fellow come ashore and keep another one working, that make me mad, and made me come ashore." He also says he had a dispute about wages to the amount of $3. He testified: "I find fault be-

cause they wouldn't pay me the three dollars, because I had been working for it. I find fault. I was mad—of course, I had been working, and was mad." In this condition of mind, and in anger with the officers of the schooner, Santos was taken by a representative of the respondent to the Lafayette Hotel, in Portland, where he made a statement. Others of the crew were also taken there, either with him or later, some of them not altogether sober, and either upon assurances of compensation or by threats of arrest. Under these conditions they were induced to make statements to the counsel for the respondent.

After the libelants had opened their case and examined two witnesses, their counsel presented to the court a petition entitled, "Motion and Application of the Libelants Relative to the Examination of Witnesses." In that petition they set forth all the efforts of the steamer's counsel to obtain evidence from the crew of the schooner, the alleged interference of counsel for the respondent with Santos and other witnesses, the manner in which communication was obtained with Santos, allegations that Santos had been kept under the dominion and control of the counsel for the steamer, followed to distant parts of the United States, brought back to give his testimony, and of the improper conduct of counsel in the premises. The court was asked to extend their rights in reference to cross-examination of witnesses, and in other ways, on account of the facts set forth in the petition. I did not then allow the petition to be filed as part of the record of the case, taking the view that it was useless to cumber the record with such matter, when the rights of the parties could be as readily passed upon by the court without such petition being filed. I allowed, however, the petition to go upon the files de bene esse for any further action of the court which should be deemed proper in the premises. A few days thereafter, counsel for respondent offered to file de bene esse a paper entitled, "Exceptions and Answer of Respondent to Petition Filed by Libelants Relative to the Examination of Witnesses." Respondent offered testimony in support of its contention. After all the testimony in the case had closed, counsel for the respondent moved that the petition and answer and all papers and testimony relating to the matter, which had been admitted only de bene esse by the court, during the progress of the trial, touching said petition and answer, and the subject-matter thereof, be expunged from the record, and this motion was argued. So much testimony had crept into the record regarding the petition and answer that I overruled the motion, and admitted the petition and answer into the record, and said that, in considering the case, I would pass upon the material matters alleged in those papers. Some of the charges made in the petition seem to me to be immaterial. Some of the charges in the answer were not supported by testimony, and contained matter which appear to me improper and outside the record. I am still of the opinion that the filing of the petition and answer in the case served no useful purpose. The facts were all before the court with reference to the alleged improper solicitation of the schooner's witnesses by the steamer. The cumbering of the record with the petition and answer did not, in my opinion, aid in the administration of justice in the cause. I stated to counsel, however, that I would consider the whole subject, so far as it became

material to the decision of the case, and no farther. The presentation of these facts, which I have enumerated, as to the solicitation of witnesses, did, however, develop the fact that Santos was angry with the schooner; that he was in a frame of mind to make him desire to injure the schooner; that he was solicited by an agent of the steamer; and that this condition of anger with the schooner prevailed throughout the case, and showed itself in his testimony and in his manner of testifying. The testimony fails to satisfy the court that the respondent's counsel were guilty of an attempt to bribe the schooner's witnesses, or that it was their intention to improperly tamper with them. The counsel for the steamer who went to Portland to obtain the statements of the crew of the schooner was a young man, and was not acting as the senior counsel in the cause. In zeal for his client, he went, in my opinion, beyond the proper functions of counsel in an admiralty cause. I am certain that the agent, Quinn, who was "left to his own resources," went far beyond what was proper in the premises in obtaining the statements of the crew. It is proper for me to say as to the conduct of admiralty causes that evidence of attempts on either side to interfere with witnesses who are upon the other vessel is always looked upon with suspicion by maritime courts.

In The Monticello, 1 Lowell, 184, 188, Fed. Cas. No. 9,739, Judge Lowell said:

"There are three witnesses who stand in a peculiar relation to the case. They are steamer's men, called and examined on behalf of the schooner. The fact that they are used on that side has been severely commented upon, and some remarks of Dr. Lushington were read, in which that learned judge disparages affidavits taken from the hostile camp, as he expresses it. Anything like tampering with witnesses would deserve and would receive the sternest reprehension of the court, but the case shows nothing of that sort." The Twenty-One Friends (D. C.) 33 Fed. 190; The Commerce. 3 W. Reb. 286; In re Atwell (D. C.) 140 Fed. 368; The Jane v. The Great Eastern, Holt's Admiralty Court Cases on the Rule of the Road, 167; The Enmore v. The Belle Hooper, Cook Rep. 139; Jensen v. Belgenland (D. C.) 5 Fed. 86.

As Judge Lowell has said, anything like tampering with witnesses would deserve, and would receive, the sternest reprehension of the court. In the case before me, however, the zealous junior counsel for the respondent is not implicated in the acts that the agent of the steamer performed in going aboard the schooner. Those acts of the agent were reprehensible and improper. He obtained the statements of the crew by deceit, and, while there is no evidence of bribery, there is evidence of improper conduct on his part. He testifies that he acted on his own resources. There is not sufficient evidence to inculpate the proctors for the steamer. It is my duty, however, at this point, to say that the prevailing and best opinions of courts of admiralty are more and more unfavorable to the solicitation on the part of one vessel of the other's witnesses. In view of the conclusion which I have reached, and inasmuch as all the testimony relating to this matter has become a part of the record, it is not necessary for me to say more upon this subject. The cause will undoubtedly go to the Court of Appeals, and, rather than attempt to deal further with it in the first instance, I deem it better that the Court of Appeals give it such consideration, and take such action, as that court may deem proper.

When we come to examine the result of this solicitation of witnesses, we find that, with regard to all the other witnesses, except Santos, it had no apparent effect. The other witnesses generally testified without evident bias, and with apparent fairness. Santos was obviously angry with the officers of the schooner, and appears to have allowed his anger to give some bias to his testimony. He testifies that he went on watch at 8 o'clock on the night of the collision; that his duties were to blow the horn and keep a lookout; that in doing this he walked across the forecastle head while he kept a lookout; that the horn was standing on the middle bitt; that he was walking across, blowing the horn all the time; that he was blowing three blasts, which took about 20 seconds for each group; that the horn made so much noise that, while he was blowing it, he could hear nothing else; that the second mate took him off the lookout to help jibe the jibs over; that, while on the lookout, he heard steamers blowing whistles, and sailing vessels blowing horns, and reported them; that, before starting on the jibs, he heard the Juniata blow one blast on the port bow, and did not report it; that he blew the horn about a minute before he started to work on the jibs; that he helped with the flying jib, the outer jib, and the fifth jib; that it took "about a minute and a half or two minutes" to put over the flying jib, and "about the same" to put over the outer jib and the fifth jib; that it took about five or six minutes to put over all the jibs. He says the reason it took so long to put over the jibs was "because the jibs got caught on the stays," they pulled very hard and slow, and the "wind was blowing against the sails"; that there were four men working on each jib; that there was no one on the lookout when he worked on the jibs; that while working on the jibs he was about four or five steps from the horn; that he heard the captain sing out something which he did not understand, "and at that time Pedro Cardozo was coming forward to help us pull on those jibs"; that the second mate asked Cardozo what the captain said, and he told the second mate that the captain said to keep the horn going, and at that time he was pulling on the jibs, and the second mate blew once three blasts. He says that Cardozo told him to blow the horn at that time, "because our life depend on that horn," but that he did not blow it, "because that time the second mate blew it"; that he blew the next horn after the mate blew the three blasts, and he fixes the time at about five or six minutes after the mate blew the three blasts before the next blast was blown; that he blew one blast, and then he got frightened and ran aft. He further says he blew the horn the last time, and that was the time he heard the steamer blow. He testifies that he saw her at that time, and that she was so near the schooner that he went to the horn and started to blow, and he says: "I could not blow more than one blast because she was so near together that I could not blow any more, that I ran aft." He further says: "He was so close that I run aft and when I got about midships house they struck." He says the steamer was coming fast. In his various depositions, he gives the time between the mate blowing the three blasts and the next horn as between four and six minutes; that he knows this from the time it took him to work upon the jibs, and also from his hearing the steamer's whistle. McLaugh-

lin, the second mate, was in the master's watch, after 8 o'clock. He testifies that Santos was blowing three blasts in succession upon the horn at an interval of less than a minute between the groups of three blasts, and that there was no time in the evening when there was an interval between the groups of more than a minute. He testifies that at about 9:30, the captain gave him orders to jibe from port to starboard; that Cardozo and Silvar executed the orders with him; that they began with foresail No. 1 and ended with spanker No. 5, and he and Silvar started forward shifting over the boom tackles and hauling them taut as they went forward, leaving Cardozo with the captain to shift the spanker boom tackle over; that, after the boom tackles had been shifted, he gave orders to trim the jibs over from port to starboard, and about this time he heard the captain say something which he did not understand, but Cardozo, coming forward, told him that the captain said: "Keep that—blow that horn oftener." At that time, he says: "I knew there was a steamer approaching and he wanted the horn blown more frequently." He says that he had noticed during all his work on the sails that the horn was blowing often and loud, "three blasts in succession"; that, after getting the captain's order, he repeated it to Santos on the lookout; that they then began to shift the jibs over from port to starboard; and that, while doing this, he noticed Santos still at the horn, and he was blowing three blasts in succession. McLaughlin testifies that he himself then went to leeward "six or eight steps" and took in the slack of No. 5 sheet, which took "from five to fifteen seconds"; that he then started taking in the slack of No. 4, when he "noticed that Santos wasn't at the horn"; "that he was standing right by me." He says: "I took the horn myself. * * * I went to the horn myself, sir, and blew three blasts." He testifies distinctly that it had not been over 20 seconds from the time he heard Santos blow the horn until he himself blew the three blasts. He says he blew "three blasts in succession, loud, sir," and "when I got done blowing the horn I turned round, and Santos was right behind me. I says: 'Here, take the horn and blow it.'" And that Santos thereupon took the horn and blew three blasts. He says the reason why he himself went and blew the horn when he noticed Santos a few steps away from the horn at the sail was "because I knew the captain wanted the horn blown more frequently. * * * The last blast which was given on the vessel was at the time of the collision. The man hadn't time to give it the whole group of three blasts. He only had the time to get out one blast of the group before the steamer was into us. He left the horn and ran aft." He says he heard the Juniata blow two blasts a very few seconds before the collision, when she was "100 to 150 feet, thereabouts" away, and that the one blast of the horn of the schooner was blown after the blowing of the two whistles of the Juniata.

He is very positive in his testimony that the one blast of the horn was blown after the two blasts of the whistle blown on the Juniata, and that then "the steamer was into us." McLaughlin makes a favorable impression as a witness. He contradicts Santos squarely on the vital point of his testimony.

Cardozo was also in the starboard watch. He testifies that he has followed the sea for 20 years. He is a naturalized American citizen, and holds a first mate's license for all oceans. He gave his testimony with intelligence. He says that he has had large experience blowing horns; that the horn gave a loud noise, and he would have noticed any cessation of it during the few minutes before the collision. He testifies to all the circumstances about the jibing over; that the fog horn was going all the time at intervals of about forty seconds; that he heard the captain say, "Blow the fog horn oftener," and he repeated the order as he went forward, and gave it to the second mate; that after this he noticed that the horn was blown oftener than it had been before, and he thought the interval was about 25 seconds; that when he went forward they had No. 5 jib hauled over, and had just started on hauling over No. 4; that when he got to No. 4 he noticed Santos was on that sheet, and he said at once to him: "Let go and go and mind the horn. That is what our life has to depend on;" that Santos then left the sheet and he took his place; that at the same time he heard the horn blowing, and it blew three blasts. After that he heard the horn blown three blasts again. After that, he heard the captain at the same time sing out: "Hard down! Hard down! Call the watch!" He looked and saw the steamer coming. He testifies distinctly that, at the time when he saw Santos at No. 4 sheet, Santos was about three feet away from the bitt where the horn was, and that he left the sheet when Cardozo told him to do so. His testimony is corroborated by Silvar, the other man in the same watch, who says that Santos worked only upon No. 4. McLaughlin is strongly corroborated in his testimony that he blew the horn a group of three blasts during the time while Santos was away from the horn, and that Santos blew it again immediately after. Some of the witnesses think that Santos blew one group of three blasts after the second mate had blown, and then started to blow a second group when the steamer was into them and he ran aft. Others testify that, after the second mate had blown, Santos seized the horn and only blew one blast when the vessel was upon them and he ran. The testimony of the second mate and of all the men upon the ship who were competent to testify upon that subject is that it took but about 15 or 20 seconds to put the sheets over. From actual tests made, No. 3 jib was hauled over in 20 seconds, No. 4 jib in 22 seconds, and No. 5 jib in 15 seconds.

The whole weight of the testimony is that Santos assisted in hauling over No. 4 jib only, which could have taken but a few seconds. Learned counsel for the schooner insist that Santos' testimony with reference to the time he was away from the horn is a deliberate falsehood, told for the purpose of injuring the schooner. I do not believe his testimony as to the length of time after the mate took the horn until he himself returned to it. Nor do I believe his testimony as to the time he was at work upon the sails. It may be that he merely exaggerated the time, just as those upon the steamer exaggerated the length of time after they heard the schooner's horn and before the vessels came together. His bias against the schooner did not tend to restrain and limit his exaggeration as to the length of intervals of time, and, although his shipmates afterwards called his attention to the fact

that he was wrong in his statement, he several times told them that he should not change it, because he was afraid he would be imprisoned if he did so. I have already had occasion to refer to the tendency to exaggerate the lapse of time during a collision. This tendency is well known and recognized in the courts. Santos followed it, and committed himself to an exaggerated statement of time. He has persistently refused to modify in any particular the statement which he first made to respondent's counsel, and he has always adhered to his set form of expression. But all the other testimony in the case is inconsistent with Santos' account. In Capt. Creighton's anxiety about the steamer's approach, and with the great strain upon his mind, in the fear that she had not located the schooner, he gave the order to have the horn blown oftener. The testimony shows that, as a result of his order, the time between the groups of blasts had been shortened from a period of about 45 seconds to somewhere between 20 and 25 seconds, and that he was watching with the utmost intensity for the steamer to break out of the fog, in order that everything should be done upon his vessel which could in any way give the earliest notice of her location. I cannot believe that there could have been a lapse of anything like two, three, or four minutes, or even of more than one minute, before the captain would have noticed it and given the proper order. The whole conduct of Capt. Creighton during the evening leads me to this conclusion. It was during this time that Santos heard the whistle of the steamer and did not report it. It is not of the slightest consequence whether he reported it or not. The captain has testified that he heard it; that he was taking action with reference to it; that everything was being done upon the schooner which could possibly be done with regard to it. I do not know whether Santos' object in testifying with reference to his failure to report is for the purpose of injuring the schooner or not. It has no tendency to so injure it. For the whole attention, not only of the captain, but of many of the schooner's crew, was directed to the steamer's approach. The captain was alarmed for the safety of the schooner and for the lives of the persons aboard of her. He was most insistent and anxious. It is impossible that, in this state of mind, he heard a single blast without noting it, unless it was blown at the moment when the steamer was upon the schooner. The improbability that the captain failed to notice the proper signals of the fog horn at the proper time is as marked as in the case of The Columbian, 100 Fed. 991, where, in speaking for the Court of Appeals in this Circuit, Judge Putnam said:

"The captain had come on deck, and he had heard the horn blowing while he was below. He had followed the sea for over 20 years, and had been a master for over 11. The lookout had followed the sea for over 30 years, and the man aft for 23. The result was to have bred in these men an instinct to give the proper number of blasts for the tack the vessel was on, especially after the steamer was heard approaching, and also to lead the man at the wheel and the master to have done as the latter testified he would have done in case there had been but single blasts; that is to say, to have corrected the error in the quick and emphatic language of those who follow the sea."

The very great preponderance of evidence in the case induces the belief in my mind that the schooner was not at fault in the matter of lookout, or in the matter of blowing signals upon her fog horn.

3. The steamer accuses the schooner of fault for excessive speed in the fog.

Capt. Creighton testifies from the log that, with all sails set at 5:30, when he passed Great Round Shoal whistling buoy, the speed of the schooner was about four knots. Half an hour later, he reduced her sails, and after such reduction her speed was three knots an hour. He testifies that he gives this testimony from a careful examination of the log, that he read the log shortly after the collision, and that from 5:30 until 10 o'clock the schooner had logged 13½ knots. He testifies that with a speed of three or four knots, the Harwood Palmer would answer her helm "very slow and sluggish," and would have "barely steerage way." The mate says that when he came on deck, at 8 o'clock, the speed of the schooner was about 2½ knots, and, at the time of the collision, 2½ to 3 knots. The evidence from those on board the schooner is to the effect that their vessel had barely steerage way at the time. As tending to corroborate these witnesses, evidence was introduced that, immediately after the vessels had cleared each other, and before any change had been made in the course or speed of the schooner, some of her crew, by the master's orders, lowered her power launch into the water from the stern davits and got into her; and yet no difficulty was experienced in lowering the launch, or after she was in the water, although she was directly athwartship of the schooner's course; and it is contended that she would have been over-turned and filled if the schooner had been proceeding with much speed at the time. I think this circumstance has probative force on the question of speed. The steamer sets up in her answer that, at the time of collision, the schooner appeared with all sails set; but there is no testimony to bear this out. It appears that neither Capt. Nickerson, his first officer, the lookout, nor the quartermaster, saw any of the schooner's sails to recognize them. The testimony on behalf of the steamer with regard to the schooner's speed is based largely upon the wind velocity, and other circumstantial evidence. The respondent has also introduced a large amount of expert testimony in the effort to show the relative speed of the schooner and steamer, contending that the schooner was proceeding relatively faster than the steamer at the time of the collision.

Before coming to any theories about relative speed, I ought to say that the preponderance of evidence shows that the schooner was proceeding at the rate of 3 to 3½ knots an hour; that the steamer was proceeding at a speed of not less than 10 to 11 knots; that she had approached so near the schooner that, although her engines were reversed, her headway was not checked to any great extent before the collision occurred. The whole testimony shows that the vessels separated, and the steamer disappeared with great rapidity in the fog; that so great damage was done that there must have been high speed upon the part of one, or both, of the vessels; and, as I have said, the preponderance of evidence shows that the greater part of this speed was that of the steamer. Now, it was the unquestioned duty of the steamer to proceed at such moderate speed in the fog that she could have been brought to a full stop before reaching the schooner. Notwithstanding she failed in this, she undertakes to show by a the-

ory, based on expert testimony, not that she came to a standstill, as it was her duty to do, in order to avoid a sailing vessel, but that her relative speed was much less than that of the schooner. If I understand her learned proctors, her position is that she was reduced to two knots, and the schooner to about five knots, at the time of the collision.

To summarize briefly the affirmative and direct testimony as to speed: The vessels were sailing upon courses which intersected at an angle of 2½ points; and the testimony tends to show that they came together at an angle of about 3 points. The impact of the collision was a very violent one. The preponderance of evidence tends to show that the steamer struck the schooner on the port side of the bowsprit and jib boom with very great force, so that all the headgear, as well as the jib boom, were carried away. The jib boom was 20½ inches in diameter, Oregon pine, and the bowsprit was 29 by 30, Oregon pine, the largest ever put into a schooner, and would stand upwards of 200 tons strain at its outer end, without the strengthening of the stays and guys. This was broken off at the stem. All of the guys connected with the jib boom, consisting of 3¾, 3½, and 3¼ inch iron wire, were carried away. The double bowsprit shrouds, 1⅛-inch iron, and the jib stays of 5½-inch wire, were also carried away. The schooner had in her starboard hawse-pipe a Baldt anchor, weighing 8,700 pounds; and the shank of the anchor was constructed of 8 by 9 inch iron. The shank was broken off within 2 feet from the point where the flukes join, and the flukes were carried along between the hulls of the two vessels for a distance of about 15 feet, plowing holes through the solid part of the schooner's bow. The hawse-pipe, weighing 2,700 pounds, and constructed of iron 3 inches in thickness, with a collar between 5 and 6 inches in thickness, was broken off. The white oak cathead, 13½ by 16 inches, was bent back, broken off, slivered up, and crushed. There were two holes made in the schooner's bow above the water line, the lower hole about 15 feet long and 2 feet wide, and the next hole, directly above it, 5 by 2½ feet wide. One of the flukes of the anchor went through the poop-deck waterways which was 14 by 14 inch, hard pine. The gammon-strap of 2¼-inch iron, made with a plate across the top of the bowsprit, welded into a plate 4½ by 1 inch, bolted so as to hold the bowsprit down, was broken. The damage to the steamer is also indicative of the speed at which the vessels came together. The schooner's jib boom and bowsprit came in over the steamer's gunwale or waterway. The steamer's teak rail on the starboard side, beginning about 25 feet aft of the stem, and extending aft for a distance of 150 feet, or to the after boat davit, was carried awy. Two of the three stays from the foremast to the bow were also carried away or parted. The steamer's foremast was of Oregon pine, 22 by 24 inches, and was broken about 2 feet above the pilot house deck. Beginning about the center of the front of the pilot house, the whole starboard side was carried away. The promenade deck was torn off. The starboard side of the captain's and second mate's rooms, the smoking room, and staterooms, as far back as the messroom, were also torn away. One boat was carried away, and two smashed. The smokestack, the steam pipe,

and the starboard fore rigging were carried away. There was a big hole broken through the starboard side, which extended from 25 to 27 feet in length and 5 to 7 feet up and down, to a point about a foot above the water line. Several of the steamer's beams and eleven reverse frames were fractured and nine were bent. The force of the collision also gave the steamer a heavy list to port. Notwithstanding the force of the collision and the breaking power of the parts of the two vessels that came together, and the fact that the steamer's engines had been reversed full speed astern, at the time of the discovery of the schooner, yet, as I have observed, the preponderance of evidence tends to show that her speed was not perceptibly reduced by the collision, and she passed the schooner on the latter's starboard side, and was soon out of sight in the fog, while the schooner was proceeding so moderately that a boat could be launched athwart her course without overturning or filling. The testimony shows further that the steamer continued to go ahead after the collision for nearly 10 minutes; and, when she was brought to a standstill, had gone from half a mile to a mile.

As to the speed of the two vessels, I must take into consideration the weight of the testimony of those on board the schooner, which shows, as I have said, that the schooner's speed was from 3 to 3½ knots. It is admitted that the steamer was proceeding at the rate of from 10 to 11 knots up to the time of first hearing the horn of the schooner. The court has no hesitancy in reaching the conclusion that the greater part of the speed which caused the damage to which I have referred was the speed of the steamer.

But, against this affirmative, direct, and positive testimony, the steamer interposes a theory that the relative speed of the schooner was much greater than the speed of the steamer. Learned counsel for the steamer have set up the theory that a study of the indentations upon the side of the steamer indicate that, when the vessels came together, there were oscillations of the steamer, and that the periodicity of oscillation of the steamer, while in contact with the schooner, tends to show the relative speed of the two vessels. The steamer has introduced the testimony of some of the most learned and scientific men in the world. who have testified at great length; and some of them have reached the conclusion that, if their theory is right, and, assuming that the absolute speed of the schooner was 3½ knots, the speed of the steamer was about 1½ knots. Learned counsel for the schooner have introduced other scientific men who have testified with equal certainty that there is nothing in this theory, and have drawn absolutely different conclusions from the facts. This element of the case also caused a conflict of counsel as to whether all the facts bearing upon the question had been submitted to the scientific experts called by the steamer. In examining the case since the arguments of counsel, I have tried to restate the testimony and the conclusions of the several experts on either side, upon this point; but I do not find that I have been thereby assisted in forming a judgment upon the speed of either vessel, or upon any other issue in the case. I do not therefore think it worth while to embody such restatement in this opinion, or to further comment upon the evidence touching this branch of the case.

The preponderance of direct, affirmative evidence induces the belief in my mind that the schooner was proceeding with moderate speed in the fog; that her speed was somewhere from 3 to 3½ knots. Speed in a fog is relative, and is governed by the circumstances of different cases. Four knots an hour has been distinctly held to be moderate speed, under circumstances similar to those in the case at bar. The Chattahoochee, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801; The N. Strong, L. R., P. D., 105; The Mount Hope, 84 Fed. 910, 29 C. C. A. 365; The Martello (C. C.) 39 Fed. 505.

I find that the schooner was not at fault in proceeding at an immoderate rate of speed in the fog.

4. The steamer accuses the schooner because the schooner's lights were located in violation of International Rules, art. 2c (applied in article 5 [U. S. Comp. St. 1901, pp. 2876, 2877]). in that they did not show an unbroken light from right ahead to two points abaft the beam.

No definite statement upon this subject was made in the original answer. In his inspector's report, Capt. Nickerson sets forth:

"That the horn was heard by the lookout, first officer and by me at the same time. * * * In a short time saw both lights of the schooner which afterwards proved to be the Harwood Palmer."

An amendment to the answer was made, setting up this defense, and one of the learned proctors for the steamer offered certain evidence upon the point, and said:

"Our position will be that we can establish beyond a doubt the possibility of the obscuration of those lights by those sails; and we are putting in evidence to show that the sidelights upon the Harwood Palmer were not so located that they were bound to show an unbroken arc from straight ahead to two points abaft the beam."

He insisted that it was sufficient for the respondent to show the possibility of an obscuration in order to bring the matter within the rule stated in The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, and in Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218, and to put the burden upon the libelants to show, not only that the schooner's lights would not, but that they could not, be obscured. The testimony in behalf of the libelants shows that the lights were carried in the main rigging, because the schooner was wider at this place and straighter on the sides, and so that the spray would not fly over the lights so much in heavy weather. There has been much conflict of testimony upon this point. There has been some evidence as to the use of a sail plan of the schooner by the respondent, which did not show the exact state of facts in regard to the sails, and which, it is claimed, was not intended for, and was not used in, designing or constructing the sails. There has been testimony as to a rule with reference to the foresail being trimmed so that the lights could not be obscured, and that this rule was carried out on the night of the collision. The evidence, however, which seems to me to have the most probative value, is that, as a matter of fact, Capt. Nickerson admits that he saw the schooner's lights as he came into a proper position to see them, just before the vessels came together. The evidence satisfies me that the lights were properly located, and were not set in conflict

with the rule requiring lights to be located to show an unbroken light from straight ahead to two points abaft the beam. The testimony further shows, as I have indicated, that both lights were seen on board of the steamer when she was directly ahead and therefore, at the time when, if there had been any obscuration, it would have been most obvious. The lights, then, were actually seen at the time when they ought to have been seen. The preponderance of the evidence satisfies me that no obscuration of lights contributed to bringing the vessels into collision. I find, therefore, that the schooner was not in fault by reason of any improper location of her lights.

5. The steamer charges that the schooner was in fault for having an improper construction of her wheel and model, in that she required from two to ten minutes to change her course.

The learned proctors for the steamer make this accusation against the schooner in their brief and argument. They found the charge, I suppose, upon the testimony of Capt. Creighton. He was asked:

"Q. How many turns of the wheel are requisite to put the wheel from amidships to either hard aport or hard-a-starboard?

"A. Seven and a half.

"Q. How long does it take at the best to put it from amidships to hard up or hard down—the wheel?

"A. About 35 seconds, laying still.

"Q. How would that question of time be affected if she were moving under canvas?

"A. Slower; the faster she was going the slower it would be to put the wheel up."

And on cross-examination he was asked:

"Q. As I understand it, your wheel had a very fine thread in it?

"A. Yes, sir; a little finer than most of the vessels."

He then testified substantially the same as on direct examination as to the time it took to carry from amidships hard over either way.

There is not enough in the testimony to convict the schooner of having an improper wheel, or of being of an improper model with reference to requiring too great a time to change her course. The question raised on this point is not a vital one. The construction of the wheel did not contribute in any way to the collision, and could not possibly have contributed in any way to the collision; for, when the vessels were coming together, and the order was given by the captain to change the course of the schooner, no wheel could have accomplished the change of course with such speed as to have averted a collision. If there had been a fault, it would clearly have been a fault in extremis, and while the vessel was in peril brought upon her by the high speed of the steamer.

6. The steamer accuses the schooner of fault for disobedience of the captain's order in putting wheel down, when the captain's orders were to put it "hard up."

The proof does not sustain the allegation. The only reliable, positive testimony upon the subject is that of the captain. He testifies as follows:

"Q. At the time you shouted the order 'hard aport' to the steamer and 'hard up' to your man, whether or not it was possible for your vessel to make any variation of her course before the steamer struck her?

"A. No, sir; it was not.

"Q. Why not?

"A. He wouldn't have time to shift the wheel before the steamer was into us.

"Q. Why would the schooner have moved as slowly as that?

"A. She was going very slow in the first place, and then she is a big vessel, a big draft of water, and steering the wheel by hand it naturally goes slow.

"Q. And it is your judgment that in the short space of time there was after you saw the steamer it was impossible for your vessel to have swung either way, I understand?

"A. Yes, sir; it was impossible."

This question, too, is not a vital one. It is perfectly evident from the testimony that, after Capt. Creighton gave his order to the wheelsman, it was too late for the collision to have been averted by any action of the wheelsman or of the wheel. And then, too, if the schooner at the moment of the collision failed to adopt any maneuver which could be suggested, and which might possibly have averted the peril, and if there were error in so failing to adopt the maneuver, the error was one in extremis, and while the schooner was in a peril brought about by the excessive speed of the steamer. In view of the fact that Mr. Jones, the first officer, states that the starboarding of the wheel of the schooner was the proper course for her to adopt after the steamer had starboarded, it seems unnecessary for me to pursue this contention further.

7. The schooner is also charged with fault for continuing to jibe right up to the collision, thus diverting the attention of her lookout and crew.

I have already commented upon the testimony relating to the jibing, in referring to the alleged faults of the lookout. The evidence shows that the fore and aft sails had all been jibed before the collision, and that the work that was being done upon the head sails in no way interfered with the schooner's obligations to the approaching steamer; that the only thing the schooner could have done at that time, while the steamer's course and action were unknown to her, was to hold her course and give signals upon her horn, and in both these particulars the schooner performed her obligations. The evidence induces the belief in my mind that, after the discovery of the steamer, the captain and the crew of the schooner did everything possible to avert the peril, and that their attention was not diverted by the jibing of the sails or by anything else. I have already found that the jibing of the sails did not interfere with the duties of the lookout, Santos. I find, also, that it did not divert the attention of the crew, and did not in any way add to the peril of the two vessels.

In conclusion, then, I find that the steamer's immoderate speed was the sole, direct, and immediate cause of the collision. I find, further, that the schooner was without fault.

A decree may be entered for the libelants.

An assessor may be appointed to report the amount of the libelants' damages.